UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
CLERK
12/17/2015 11:50 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

------------------------------------------------------------x

ROBERT GERAS,

                  Plaintiff,

     -against-

HEMPSTEAD UNION FREE SCHOOL
DISTRICT, BOARD OF EDUCATION OF THE
HEMPSTEAD UNION FREE SCHOOL
DISTRICT, and BETTY CROSS,

               Defendants.

------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
13-cv-5094(ADS)(AYS)

**APPEARANCES:**

**Law Office of Steven A. Morelli, P.C.**
*Attorneys for the Plaintiff*
1461 Franklin Avenue
Garden City, NY 11530
     By:    Steven A. Morelli, Esq.
            Joshua S. Beldner, Esq., Of Counsel

**The Scher Law Firm, LLP**
*Attorneys for the Defendants*
One Old Country Road, Suite 385
Carle Place, NY 11514
     By:    Austin R. Graff, Esq., Of Counsel

**SPATT, District Judge:**

     This case involves allegations of reverse racial discrimination by a Caucasian

Assistant Superintendent against the Hempstead Union Free School District and

its Board of Education.

     On September 12, 2013, the Plaintiff Robert Geras ("Geras" or the "Plaintiff")

commenced this civil rights action against the Defendants Hempstead Union Free

School District (the "District"), the Board of Education of the Hempstead Union Free School District (the "Board"), and the former President of the Board, Betty Cross ("Cross," together with the District and the Board, the "Defendants"), alleging unlawful discrimination, hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.* ("NYSHRL"); and 42 U.S.C. § 1981 ("§ 1981") and § 1983 ("§ 1981").

Presently before the Court is a motion by the Defendants, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56, for summary judgment dismissing the complaint.

## I.      Background

Unless otherwise noted, the following facts are undisputed and are construed in the light most favorable to the Plaintiff.

## A.      The Plaintiff's Employment

The Plaintiff is a Caucasian male.  Beginning in November 2009, he was employed by the District as its Assistant Superintendent for Business and Operations.  In this capacity he was, effectively, the District's Chief Financial Officer, with responsibility for overseeing the District's finances, business dealings, and a number of supporting departments.  He also oversaw approximately 150 to 200 District employees.  His immediate supervisor was one Patricia Garcia, Ph. D. ("Dr. Garcia"), the District's Superintendent of Schools.

Geras alleges that, at all relevant times, his performance was "outstanding." In this regard, the Plaintiff testified that his performance evaluations were conducted in a two-step process: first, he completed a self-evaluation; then, he met with Dr. Garcia, who would review the self-evaluation and provide her own evaluation.

On a self-evaluation for the 2010-2011 school year, Geras reported that he had "exceed[ed] expectations" in the area of leadership. He testified that Dr. Garcia agreed with that assessment and "totally endorsed" his response as "accurate and consistent with her evaluation of [him]." According to Geras, the following year, Dr. Garcia again "praise[d] [him] as an outstanding administrator" and advised him that he would be recommended for tenure.

This is consistent with Dr. Garcia's testimony that, in the years that Geras worked for her, his performance was "outstanding." She testified that he "behaved with the utmost integrity all the time"; he "kn[ew] the job very, very well"; and he "saved the district a lot [of] money and put in place systems to move the district forward." Dr. Garcia stated that Geras had high expectations for his employees, but was respectful, and was focused on "getting the task done." According to Garcia, "[t]here was never a doubt in [her] mind that Mr. Geras deserved tenure." Further, she testified that, based on his performance, she had no concern that the Board would not grant him tenure.

Dr. Garcia testified that, after being hired as the Superintendent in 2009, she learned that, historically, the District lacked adequate financial programs and

oversight. She stated that, at the beginning of her tenure, the District had no meaningful credit and could not borrow money. However, by July 2012, three years into her and Geras's employment, Standard & Poor's rating service for government finance had given the District the highest short-term outlook rating available to local government, and the third-highest long-term outlook rating. Dr. Garcia testified that Geras's expertise "definitely" played a significant role in obtaining these favorable ratings. This testimony is consistent with a July 11, 2012 memorandum that Dr. Garcia wrote to the Board, stating, in relevant part:

> The [Standard and Poor's] ratings are a result of responsible budget management beginning in 2008-09 and continuing to present and the presentation made to Standard and Poor's by Robert Geras and NYMAC, our fiscal advisor. . . .

> Previous to us receiving the aforementioned financial ratings, the district did not have a credit rating since sometime in the mid-2000s. This "Non-Rated" status was primarily a result of significant budget overspending in 2003-04, 2005-06, and 2006-07 Fiscal Years.

## B.     The Facts Relating to Annette Greer

Annette Greer is a long-time District employee. From 2000 to 2004, she worked as a Community Aide; from 2004 to 2009, she worked as a Clerk Typist; and in 2009, she was promoted to Assistant Supervisor for Transportation. At all relevant times, the Plaintiff was her supervisor.

In her deposition, Greer testified that Geras harassed her. She stated that her position frequently required her to travel between District buildings, which Geras did not appreciate. She stated that he would look for her at her desk

throughout the day and sometimes would stand over her desk while she was on the phone with a student's parent and shout "who are you talking to?"

Apparently, Greer frequently complained to Dr. Garcia about the conduct of Geras, but Garcia testified that she considered most of Greer's complaints to be without merit. In this regard, on or about March 3, 2012, Greer wrote a memorandum to Dr. Garcia, with copies provided to the Board and the Assistant Superintendent for Personnel, Julius Brown, complaining about an altercation that she had with Geras. In the memo, Greer alleges that Geras yelled at her; threatened her job; and told her that "if [she] can't do [her] job then maybe he w[ould] find someone that can." There is no evidence in the record that disciplinary action was taken against Geras in response to this memo.

However, there is evidence in the record to dispute Greer's account of her working conditions. Dr. Garcia testified that Greer "was an extremely disrespectful employee to Mr. Geras" and was "very incompetent." According to Garcia, at some point, Greer was permitted to report to a supervisor other than Geras, who also found that she did not adequately perform her job. Dr. Garcia further stated that Greer had a close relationship with the individual Defendant Betty Cross, an influential member of the Board, which made her believe she could "do whatever [she] want[ed] to do." Garcia testified that if Greer did not like something that the Plaintiff did, she would go directly to Cross, who "r[a]n the district" and would "create [a] problem."

Geras also testified that Greer was an unsatisfactory employee, who, in his estimation, should not have been employed by the District. However, Greer believed that she was "untouchable" because of her friendship with Cross. He characterized Greer as an "operative" for Cross.

One particular incident involving Greer and Geras is material to this case. On June 14, 2010, a situation arose which caused Geras to urgently seek out Greer – namely, Geras testified that a student field trip was taking place off-campus, and Greer, as the transportation supervisor, had failed to arrange for buses to pick up the students. He claims to have received an urgent phone call concerning this situation and went looking for Greer. After being unable to locate her at her workstation or elsewhere in the building, as a last resort, he knocked on the door to the ladies room and called into the bathroom for her. Geras states that he never actually went into the bathroom.

A Board member named Waylyn Hobbs testified that a District investigation into the incident revealed that Geras "did in fact go into the women's bathroom." However, he clarified that Geras "didn't go completely in, but he opened up the bathroom door and was yelling inside for her to come out."

Of note, it is undisputed that neither Greer nor any other person was inside the ladies bathroom when this occurred. Greer testified that she was not on the premises at the time.

In this regard, Geras testified that the bathroom in question doubles as a storage room, and that male staff members "routinely go into the ladies bathroom

for supplies." Dr. Garcia, a woman, provided consistent testimony, stating that the door on which Geras knocked does not lead directly into the ladies room, but instead leads into a separate space where the bathroom fixtures are not visible: "There is a bathroom, but there is like a room before the bathroom." This testimony is uncontroverted.

Geras testified that he was not disciplined for this incident, but that Dr. Garcia prepared a related memo, which was kept in his personnel file. In particular, on or about August 25, 2011, Dr. Garcia prepared a memo entitled "Our Meeting of June 21, 2010," which states as follows:

> I am writing to follow up on the conversation we had on June 21, 2010. As you know, we met and discussed an incident involving Ms. Annette Greer, which occurred on June 14, 2010. As part of our discussion, I expressed to you my belief that you had exercised poor judgment by going to look for Ms. Greer in the ladies bathroom. I expressed to you that it is my expectation that you will ensure that your conduct and interactions with your colleagues remains professional. In the future, you are to send a female employee to look for Ms. Greer if a similar situation arises.

Geras testified that Dr. Garcia had been empathetic when they initially discussed the incident, and informed him that the only reason she issued the memo was because the Board pressured her to do so.

As a result of this incident, Greer filed complaints against Geras with the Nassau County Human Rights Commission ("NCHRC") and, subsequently, with the New York State Division of Human Rights ("NYSDHR"). Greer testified that no members of the Board, including Cross, influenced her decision to file the

complaints against Geras. This is disputed by Dr. Garcia, who testified that Cross "definitely" encouraged Greer to do so.

Greer further testified that, by the time her complaint to the NYSDHR had been scheduled for a hearing, Geras was no longer working for the District, so she decided to abandon the claim. In this regard, she stated that she had not "want[ed] any money or anything" and had "just wanted him to leave [her] alone." However, Geras testified that Greer's earlier complaint to the NCHRC had, in fact, proceeded before a judge, who ruled against her. According to Geras, Greer became emotional at the hearing and said of Geras and his intern, a Caucasian male, "These two white guys bother me." In this regard, Geras testified as follows:

> [T]he judge said, Pardon me? . . . Eventually she retracted that. . . . The judge ruled totally against her. And she didn't appeal it. Because she knew the decision was right. There was no basis for her complaint. I clearly remember the judge being stunned with her white remarks.

The Court notes that the present record does not contain records relating to this alleged hearing.

## C.   Additional Relevant Facts Relating to the Plaintiff's Employment

### 1.   The Allegedly Unauthorized Decision Regarding Benefits

On or about June 9, 2011, Dr. Garcia prepared a memorandum, entitled "Unauthorized Decision," which purports to memorialize a conversation that Garcia had had with Geras several days earlier. In this memo, Garcia states that Geras was "not authorized to make decisions about benefits, or inform the benefit clerk about the types of benefits that cabinet members should receive." Further, the

memo states that, "[a]lthough [Geras] explained that [his conduct] was done with the best of intention," the "decision d[id] not fall within the scope of [his] responsibility" and, thus, he was "directed to desist from making decisions that do not fall under [his] area of responsibilities" unless directed otherwise.

The events underlying this memo were described more fully by Geras and Dr. Garcia during their depositions. In particular, Geras testified that a certain unionized group of school principals and administrators had settled a contract, under which they received significant raises, and were therefore required to increase their contributions to their health care plans. As the finance director, Geras made the necessary adjustments to the District's payroll and the employees' health insurance withholdings. He did not make corresponding changes relating to any non-unionized employees who were not covered under the contract. In order to do so, the Board would have had to pass a resolution directing him to do so. In fact, Geras stated that he believed it would have been illegal for him to do so unilaterally.

Geras testified that he had done nothing wrong, but the Board manufactured a controversy and, despite its own failure to pass a resolution authorizing him to make corresponding payroll adjustments for non-unionized administrators, faulted him for not doing so. He contends that the Board harassed Dr. Garcia to create a written record indicating that he had done something wrong.

Dr. Garcia provided a somewhat different version. She stated that discussions regarding non-unionized administrators' benefits were ongoing; that a

final decision had not yet been made; and that, as the relevant deadline approached, Geras made the unilateral decision to continue what had previously been in place, without consulting her. She testified that Geras had known that she was in favor of eliminating certain benefits that he ended up continuing.

### 2. The Alleged Discriminatory Remark About Hispanics

On or about February 10, 2012, Julius Brown, the District's Assistant Superintendent for Personnel, prepared a memo to Dr. Garcia, entitled "Sexual Harassment Complaint: Ann DeLutri v. Carlos Ramirez." This Memo states that a female employee named Ann DeLutri had accused a male employee named Carlos Ramirez of "strok[ing] her buttock three times" while she waited outside Geras's office for a project management meeting to begin. Relevant here, the memo states that, during Brown's investigation into the matter, he learned that Geras had told DeLutri that "he [Carlos Ramirez] is a touchy feely person because he is Latin." The memo indicates that DeLutri informed Brown that "this made her feel violated all over again."

During his deposition, Geras testified that he had previously known DeLutri from working in a different school district. Further, it had come to his attention that she apparently was uncomfortable interacting with Ramirez because he was "too friendly." For example, it made DeLutri uncomfortable that Ramirez regularly greeted her with a kiss. However, Geras denies any further involvement in the situation; he flatly denies making the statement attributed to him; he denies even using the word "Latin" to identify someone of Hispanic ethnicity; and further

contends that Ramirez described himself as "touchy, feely." Geras asserts that he may have merely repeated the phrase used by Ramirez when discussing the investigation with Brown.

Dr. Garcia testified that this event "absolutely [did] not" give her concern about recommending Geras for tenure. However, allegedly under intense pressure from Betty Cross, she wrote a memo memorializing the incident to his personnel file.

Geras testified that he was never disciplined in connection with this incident. In fact, he stated that he was never even advised as to the outcome of Brown's investigation.

## D.    The Facts Relating to Betty Cross and the Allegations of Racism in the District

In this lawsuit, the Plaintiff alleges a culture of "ongoing racism" in the Hempstead School District. He further alleges that the individual primarily responsible for this racism is Betty Cross, an African-American female and longtime member of the Board, who eventually became its President.

Dr. Garcia, the District Superintendent, testified that from 2009 to 2012, Cross was "definitely" the most powerful member of the Board. In fact, Garcia described her as "the most powerful individual in the Village of Hempstead." In this regard, Dr. Garcia testified that "[t]he Mayor would not do anything if she [Cross] didn't want it." Discussing the alleged power wielded by Cross, Dr. Garcia testified that "[e]verybody in the school district works for [Betty Cross]. . . . [T]he only people who did not work for her were Mr. Geras and I. We didn't work for her

in the sense that we are honest, integrity, high integrity, and we did not succumb to her threats. Everybody else belonged to her." Geras testified that he routinely witnessed Cross "bully the other Board members" and, even before she became its President, she "dominate[d] the Board." The record shows that, at all relevant times, a majority of the Board was African-American, and none was Caucasian. After June 2012, the entire Board was comprised of African-American individuals.

It is alleged that Cross, who has been a Board member on and off since 1978, used her influence on the Board and in local government to advance the interests of African-Americans, while cultivating an environment of hostility toward Caucasians and Hispanics.

1.    **The Evidence of Discriminatory Animus Toward Hispanics by Betty Cross**

Before turning to the facts specifically relating to Geras, the Court notes that the record contains substantial evidence of Betty Cross's alleged discriminatory treatment of Hispanics.

Dr. Garcia testified that Cross told her that the District "deserved an African-American Superintendent" and "personally told [her] that the school district did not want a Hispanic Superintendent." In this regard, Dr. Garcia testified that, when she became the Superintendent, she did not use her married surname, Garcia. Rather, she previously was known as "Dr. Watkins." However, when she eventually made the decision to be called "Dr. Garcia," Cross refused to do so, insisting on calling the Superintendent "Dr. Watkins" and even "told [her] personally that Hempstead belong[s] to African-Americans [ ] and they will never accept a Hispanic

Superintendent." This is consistent with Geras's testimony that Cross "despised Hispanics" and "openly expressed hostility toward" them. He recalled one occasion during a public Board meeting where Dr. Garcia corrected Cross for using her maiden name. Geras testified that Cross "yelled across the dais, I didn't hire a Garcia. I hired a Watkins. You are Watkins." Cross denies these assertions.

Furthermore, Geras testified that on "numerous occasions," Cross attempted to deprive Hispanic students of actual educational benefits. For example, Dr. Garcia testified that, although the District was 68 percent Hispanic and hiring bilingual teachers was necessary, Cross openly opposed doing so. Dr. Garcia further testified that Cross had opposed providing Spanish-speaking students with Spanish language textbooks. Geras testified consistently with Dr. Garcia, stating that Cross had advocated in favor of denying funding for programs aimed at benefitting Hispanic students; personally interfered with related personnel decisions; and influenced the Board not to provide adequate services to the Hispanic community.

Cross denied these assertions, stating that the District has "plenty" of bilingual teachers; that the District "[a]lways had [its] quota"; and contending that she supported hiring additional bilingual teachers "one hundred percent."

In this regard, Dr. Garcia testified that she had advised Cross that, under New York law, if enough students did not pass English-language tests, the District would be required to provide them with support in their native language. Cross allegedly responded that "if the State attempted to come into Hempstead, she would lead marches in the streets." Cross denied making this statement.

According to Geras, Cross stated in meetings that she "does not care about those people," meaning Hispanics, and that "[t]hey shouldn't be here." On one occasion, Cross allegedly objected to Garcia's hiring of a Hispanic principal in the District's Early Childhood Center and asked "Why did you hire a Hispanic to be the principal? This is a black district. We don't want her here." On another occasion, Cross allegedly voiced objection to helping Spanish speaking students by stating "I don't care about those Hispanics. I'm here to take care of black people." Cross also denies making these statements.

Geras testified that, in the 2012 school year, the graduating high school Valedictorian and other award recipients were all Hispanic. Allegedly, when Cross learned of this fact, she "threw a fit" and "didn't want th[e] [graduation] ceremony to go on." Geras testified that Cross "wanted blacks to receive the awards of the graduating class." Geras further testified that, in his opinion, Cross's "overt" acts of racism "certainly impacted" the quality of the education received by Hispanic students in the District in a negative way.

Allegedly, Cross's outwardly hostile feelings about Hispanics extended beyond students and faculty in the District. Geras testified that, on one occasion, a contractor known as Milburn Flooring was performing construction work in a District building. According to Geras, Cross came onto the Premises and stated "[w]hat are these Hispanic people doing in my district?" Allegedly, she further stated, "[d]oesn't [Geras] know . . . I want black people working here."

Geras testified that Cross behaved similarly toward Hispanic workers employed by a contractor known as RJ Painting, who were performing painting services in a District building. Apparently, a manager of that entity filed a complaint about Cross with one Peter Cavassa, the District's Director of Facilities. Geras testified that it was his understanding that Cavassa forwarded the complaint to the then-President of the Board, Charles Renfroe, but that no action was taken.

Allegedly, on another occasion, a different contractor known as RENU Restoration and Construction was performing clean-up services and repairs following a fire in one of the schools' auditoriums. Geras testified that Cross entered the building with someone who purported to display a badge to the workers. Cross stated "I see these Caucasians and Hispanics working here. I want black people here." Geras stated that Cross used the individual with a badge to "intimidate" the workers – "She literally tried to run them off."

At her deposition, Cross could not recall any of these events. However, she substantially denied any allegations of racism.

## 2. The Evidence of Discriminatory Animus Toward Geras and Other Caucasians by Betty Cross

Dr. Garcia testified that Cross expressed a desire to hire exclusively African-American faculty in the District. In this regard, Dr. Garcia testified that Cross complained whenever an employee was hired who had "a name that she thought was not an African-American name." According to Garcia, Cross "made it clear to [her] that [she] should only hire African-Americans." Geras testified that he had heard "numerous complaints" about Cross's disparaging comments regarding

Caucasian people, and that it "was very common" for staff, principals, and administrators within the District to make verbal complaints about her. The Court will now discuss several such instances contained in the underlying record.

First, at an unspecified point in time, the District had arranged to hire two new supervisory employees to fill the positions of Director of Facilities and Director of Security. Geras testified that the position of Director of Facilities requires a highly-skilled candidate who is a graduate engineer. By contrast, the Director of Security was a "significantly lower position" and was essentially "a supervising security aide." Dr. Garcia also testified that the positions are "completely different," with the Director of Facilities having "much more responsibility than" the Director of Security. Consequently, the salary for the Director of Facilities is significantly higher than that for the Director of Security.

Dr. Garcia selected one Peter Cavassa, a Caucasian, for the position of Director of Facilities, and one Jeff Febrat, an African-American, for the position of Director of Security. Geras testified that the interviewing process had been completed; the appropriate administrative committees had approved the hires; and, of importance, both men provisionally accepted their offers of employment and agreed to their respective salary figures. Allegedly, the final step was for Dr. Garcia to "tak[e] it to the Board."

Dr. Garcia testified that Cross initially opposed hiring Cavassa because he is Caucasian. However, according to Garcia, if Cavassa was to be hired, "Cross stated that she did not want a white employee to be paid more than the black employee."

Geras also testified that Cross and another Board member, JoAnn Simmons, found it "outrageous" that "a black gentlemen was going to be paid less than the white gentleman," notwithstanding the differing nature of their respective positions. Dr. Garcia further testified that the Board, "at the urging of Cross," voted to increase Febrat's salary, even though he had already accepted the position at a lower salary. According to Geras, the result was that Febrat received a $25,000 yearly increase in his salary solely "because [Cross and Simmons] wanted to take care of the black individual."

Cross denied these assertions. In this regard, she testified that the positions of Facilities Director and Security Director are only "slightly different" and believes that "[s]omeone else may see [them] as one [in the same]." Nevertheless, she denied objecting to Cavassa's hire on the basis of his race, and denies ever expressing an opinion about the candidates' respective salaries.

Allegedly, on another occasion, the District discovered that an African-American groundskeeper had been stealing property, namely, playground equipment belonging to the District. Dr. Garcia and Geras supported referring the groundskeeper to the Nassau County District Attorney, and he eventually was arrested and indicted. Geras testified that, despite having stolen approximately $286,000 in District property, Cross advocated for his return to work and referred to Geras as "a [n]o good white man racist, just trying to get the black man." Dr. Garcia supported this account of the relevant events, testifying that Cross called Geras a "white racist" at a related Board meeting.

Apparently, while the groundskeeper's criminal case was pending in the state court, he reached the District's minimum retirement age. Geras testified that the Board allowed him to resign, with benefits, and without paying restitution to the District – an arrangement "urged and brokered by Betty Cross."

Cross denies these assertions. She testified that she never heard Geras or Dr. Garcia suggest that criminal charges should be pursued against the groundskeeper, and believes that he "resigned" from the District.

Of note, Cross denied ever calling Geras a racist, but also testified that she had heard that Geras called her "the N word." In this regard, Cross could not remember who she heard this from; when she heard it; or the circumstances under which she heard it. She also could not remember whether she ever filed a related complaint.

In any event, Geras testified that, on another occasion, the District hired a guidance counselor. Ordinarily, the Board does not interview candidates for such a position because personnel matters come within the Superintendent's sphere of responsibility. Of note, Cross agreed at her deposition that hiring decisions are made in the first instance by the Director of Personnel; approved by the Superintendent; and then, ultimately, recommended to the Board.

Allegedly, when Cross learned that the newly hired guidance counsel was a Caucasian woman, she "nagged" the Superintendent about how "that white girl has no business working in Hempstead" and how "[t]hat job should have went to" an African-American individual. At her deposition, Cross could not recall these events.

Geras testified that, occasionally, District students were recognized at Board meetings for various scholastic achievements. He stated that the students were invited to shake the hands of the administrators, but that Cross "turned away" from students who were not African-American and would not shake their hands.

Dr. Garcia also testified that Cross would state at public meetings that she preferred awarding capital improvement contracts to African-American contractors in the community. She testified that Cross has made her feelings on that subject "general knowledge" and "not a secret." Cross denied ever expressing that she preferred awarding contracts to businesses owned by African-Americans in the Hempstead community.

Geras testified about an environmental consulting firm known as JC Broderick and Associates, which occasionally did work for the District. On one occasion, the firm was performing evening work in one of the District's buildings to avoid disrupting the school day. Incidentally, a public Board meeting was scheduled for that same evening. Geras testified as to the events of that night as follows:

> At some point before the meeting people are gathering, some people at the dais. Miss Cross comes walking down the aisle, saying quite loud, numerous people are here, Who are these white girls in my building? I don't [ ] want these white girls in here. Get them out of here and bring black people in. That is what she said in the gathering. We had to – I think the Director of Facilities, Peter Cavassa, told the girls, Hey you better leave.

> At her deposition, Cross could not recall this event.

In addition, Geras testified about a similar situation involving a contractor known as Custom Clay, which had been engaged to remedy frequent flooding at one of the District's schools. Geras testified that, although the District is an equal opportunity employer and did not maintain race-based quotas, Cross again complained that she did not see enough African-American laborers working on the project. Again, Cross denied these assertions.

On another occasion, Geras testified that he coordinated a project to rehabilitate one of the schools in the District which had previously closed down – it was "[b]asically abandoned." In this regard, Geras testified that, at a public presentation at which he and others involved with the project had intended to garner public support, the following event transpired:

> Betty Cross walks down the aisle, goes to the dais. Stops the proceeding. And yells at the architect doing the presentation, and says, basically, [w]ith this project you are going to hire black people. If you don't hire blacks and they are not going to man the jobs, I'm going to march in the street and shut the project down, in a public forum.

As to that same project, Geras testified that the lowest bidder was a highly reputed group of construction managers, which the administration favored. However, Geras further testified that the Board "forced" the District to engage a predominantly African-American start-up firm based out of Roosevelt, New York at a substantially higher cost to the District. According to Geras, this maneuver violated even the Board's own policy on the use of outside consultants.

In this regard, Cross testified that capital improvements contracts were not always awarded to the lowest bidder. Rather, she asserted that such contracts were awarded to "[t]he most quality bid."

As it concerns Geras, in particular, Dr. Garcia testified that Cross "never had a good relationship with Mr. Geras from day one because he was not the Assistant Superintendent of her choice." She stated that Cross voted against hiring him and advocated instead for an African-American to be hired as the District's Assistant Superintendent for Business and Operations. Cross could not recall whether she was in favor of hiring Geras or whether she voted against Dr. Garcia's recommendation of him for employment. Dr. Garcia testified plainly that Cross did not like Geras, at least in part, because he is Caucasian.

Dr. Garcia testified that Geras was "harassed [and] belittled on a daily basis" by Cross and that he had complained to her, his direct supervisor, "all the time" about Cross's treatment of him. Dr. Garcia recalled "numerous occasions" in Board meetings where Cross would "be extremely disrespectful to Mr. Geras" and would make racially-charged comments, such as "white boy" and "[y]ou don't understand African-Americans." Geras testified that Cross "degraded," "berated," and "told lies about" him, including that he mismanaged the District's budget. On one occasion, during a break from a Board meeting, Cross allegedly told Geras and an attorney for the District, one Chris Guercio, Esq., that they "were no good white men" and that she "didn't want [them] there, and she wanted [them] replaced with African-Americans."

According to Geras, the next day, the District's General Counsel had called him to confirm the report from Guercio; stated that he found the incident to be "outrageous"; and stated that he planned to lodge a complaint with the then-President of the Board Charles Renfroe. However, Geras asserted that the Board took no action. Cross denied that these events occurred.

### 3.     The Facts Relating to Curtis Hewitt

One particular incident involving Geras and Betty Cross is directly relevant in this case.

One Curtis Hewitt was an African-American custodian employed by the District. In particular, he was the Head Custodian for the Hempstead High School and, according to Geras and Dr. Garcia, was not performing his duties satisfactorily. In this regard, Dr. Garcia testified that the high school building, which is a central building within the District, simply was not clean. She stated that she "wanted to see a shiny building," but instead, "there was garbage all around the building."

In or about March 2012, a decision was made to transfer Hewitt from the high school to the elementary school building. Dr. Garcia testified that she gave the directive to transfer Hewitt "[b]ecause [she] wanted the high school to go in another direction when it [came] to the facility itself." Geras testified that the decision was made collectively by him, Dr. Garcia, Assistant Superintendent for Personnel Julius Brown, and Peter Cavassa. He further stated that the transfer decision was based

on the needs of the District, including improving the condition of the high school and enhancing the learning environment.

The Court notes that Hewitt's recommended replacement was also African-American.

Nevertheless, Geras testified that, upon learning these facts, Cross called him on three successive days, on March 19, 20, and 21, 2012, seeking to have the transfer reversed. On the third of these calls, Cross allegedly was "irate," "berated" Geras, and called him names. Geras further testified that Cross threated to destroy him and that she would "have the community lynch [him]." Further, Cross allegedly stated to the Plaintiff that "no white man is going to come into this district and transfer a black man." Dr. Garcia testified that this remark accurately reflects "her type of language."

According to Geras, this incident was a breaking point, which he described as follows:

> [The March 21st incident] took me to the point where I could no longer endure the abuse of Betty Cross . . . . [U]p to that point I just absorbed it and suffered with it, knowing that there [wa]s very little that I could do. But at that point where she literally threatened my welfare and livelihood, I knew I had to reach out for help.

To that end, on that same day, Geras prepared a memorandum addressed to Dr. Garcia, with a copy to Julius Brown, entitled "Harassment by Board Member Betty Cross," which stated, in relevant part, that "board member Betty Cross telephoned [him] and harassed, berated and threatened [him]." The memo states that Cross sought to have Curtis Hewitt's transfer reversed and "called [Geras] a

liar, a racist and said that no white man is going to come into the district and transfer a black man." Further, the memo states that Cross "threatened [Geras's] employment" and warned him that "she would take it to the streets and get [him]."

The Plaintiff's March 21, 2012 memo also stated that "[t]he inappropriate and illegal behavior of Ms. Cross is not new" and noted that Geras had "witnessed and listened to her racist behavior toward whites and Hispanics in general" and that, "on various occasions," Cross had "made racist remarks toward [him] as a white male."

Geras requested the Superintendent's intervention, and notified her that, through counsel, he would be filing a charge of discrimination with the appropriate government agencies. In this regard, on or about March 27, 2012, Geras filed a charge of discrimination against the District and the Board with the NYSDHR, in which he alleged that he was the subject of employment discrimination, and identified Cross as a responsible individual.

Cross substantially denies that these events occurred. She testified that Hewitt was "a very nice man," but that Dr. Garcia had advised her that transferring him was "for the best." She testified that she did not necessarily agree with Dr. Garcia's decision, but "let it go." In this regard, Cross testified that, aside from voting on promotions that result in a transfer, the Board is "not really" involved in transfer decisions. Rather, according to Cross, such decisions are "mostly" made by the District's central administration, namely, the Superintendent and Assistant Superintendents.

Of prime importance, Cross testified that she does not recall ever calling Geras on the telephone; she denies demanding that Hewitt's transfer be reversed; denies calling Geras a liar or a racist; and denies ever stating that no white man would come into her District and transfer a black man. She denied ever threatening Geras or his employment and could not recall ever seeing Geras's March 21, 2012 memo regarding her treatment of him.

### 4.     The April 19, 2012 Board Meeting

The first Board meeting following the March 21, 2012 incident was convened on April 19, 2012. The Defendants submitted a video recording of this meeting for the Court's review. Relevant here, the video reveals an exchange that takes place at the commencement of the meeting, during which Cross – who is seated at the dais – asks whether Julius Brown – who is seated in the audience – has with him an unspecified resolution to be added to the Board's meeting agenda. Ultimately, following several seconds of inaudible discussion, the unspecified resolution was not added to the agenda for a vote at the April 19, 2012 meeting.

The Court notes that Cross was shown this video at her deposition but denied being able to recall any of the relevant events depicted.

Although the video itself does not provide clarity as to the nature of this unspecified resolution or the circumstances surrounding the relevant exchange, the April 19, 2012 Board meeting was the subject of testimony during the depositions in this case.

In particular, Geras testified he learned the day after this meeting was held that Cross had instructed Julius Brown to prepare a resolution calling for Geras's resignation. Geras contends that this maneuver was Cross's retaliation for his memo of March 21, 2012, which complained of alleged discriminatory treatment.

Dr. Garcia also testified as to her understanding that Cross had attempted to introduce a resolution at the April 19, 2012 meeting which would have resulted in Geras's termination, effective immediately. She further testified that "the Board is a policy agency" and "has no authority to go to the employees," in the way that Cross had coordinated with Julius Brown. In this regard, the video clearly demonstrates that even the then-President of the Board, Charles Renfroe, was unaware that Cross had intended to introduce such a resolution. Dr. Garcia testified that she views Cross's conduct in this regard as being "totally illegal." Both Geras and Dr. Garcia testified that the Plaintiff had not offered his resignation at any time prior to the April 19, 2012 Board meeting.

At her deposition, Cross could not recall attempting to introduce a resolution at the April 19, 2012 Board meeting and also could not recall asking Julius Brown to prepare a resolution calling for Geras's resignation.

Thereafter, on or about May 24, 2012, Geras filed a second charge of discrimination with the NYSDHR, again alleging that he was the subject of employment discrimination, and identifying Cross as the responsible individual. He asserted that the most recent act of discrimination had occurred on April 19, 2012.

He also charged that he was retaliated against after filing the March 2012 complaint.

### 5. The Internal Investigation into Betty Cross's Conduct

Geras testified that, in addition to preparing a memo to Dr. Garcia and filing charges of employment discrimination with the NYSDHR, he also notified the then-President of the Board Charles Renfroe, directly, of Cross's conduct in connection with the Curtis Hewitt situation. The Court notes that the record contains a memo, also dated March 21, 2012 in which Dr. Garcia also advises Renfroe of the complaints of harassment by Geras. According to Geras, the Board "felt it was a very serious incident" and appointed a special counsel, namely, one William Ferris III, Esq., to investigate the matter. This testimony is consistent with an April 26, 2012 memo from Julius Brown to Geras, with copies to the Board, the District's General Counsel, and attorney Ferris, which states, in relevant part, that "on March 26, 2012, the Board of Education appointed special investigative counsel to investigate [Geras's] complaint and prepare a report" of his findings for the Board.

In this regard, Ferris interviewed Geras under conditions similar to a deposition. The Court notes that a copy of the transcript of this interview is in the underlying record. According to Geras, it was only during this interview that he learned that Betty Cross had lodged a cross-complaint against him days after his initial March 21, 2012 complaint. Although Betty Cross testified repeatedly that she did not have any regular contact with Geras, in her cross-complaint she stated, in relevant part, as follows:

I have spoken to [Geras] on several occasions, which have not been pleasant. He speaks to me as if it's a bother to him and as if he is wasting time talking to me. I'm insulted by his attitude towards me. He doesn't provide me with the information when asked, and when he does provide it, it's not the correct information. He speaks to me like I'm a "nobody."

I resent the manner in which [Geras] addresses me. He is disrespectful. He has no respect for women, especially black women. My opinion is he speaks to women demeaning and degrading. . . .

Of note, at her deposition, Cross could not recall preparing this cross-complaint. Although she suggested that the substance of this statement is consistent with the feelings of many African-American women in the District, namely, that Geras did not respect them, she was unable at her deposition to name any person who complained about Geras in this way other than Annette Greer. In fact, Cross further suggested that no one actually made such statements to her, but, instead, she may have overheard such comments at "the nail salon" or the "beauty shop."

Although Ferris had informed Geras that he planned to interview all relevant individuals who were involved in the Curtis Hewitt incident, and to fairly report his findings to the Board, there is no evidence that he interviewed anyone other than the Plaintiff. It is undisputed that Ferris's engagement was terminated before his investigation was complete and before he issued any findings relating to the Plaintiff's complaint of discrimination.

The circumstances surrounding the termination of Ferris are unclear. Geras testified that, to date, he is unaware of any documents or Board resolutions officially terminating Ferris's engagement. In fact, he only learned that the

investigation had been prematurely terminated through word of mouth from Dr. Garcia.

Dr. Garcia testified that Ferris was discharged in June 2012. According to Garcia, this is significant because Board elections were held in May 2012, which resulted in Cross being elected President of the Board, and two new members, namely, Waylyn Hobbs and Shelley Brazley, being elected to replace outgoing Board members Brandon Ray and Gladys Rivera. Dr. Garcia noted that the Board had been interested in investigating allegations of discrimination by Cross prior to May 2012. However, one month after Cross became the Board's presiding officer, a decision was made to discontinue the investigation into her actions.

At her deposition, Cross could not recall ever meeting with Ferris and could not recall the circumstances under which he was discharged.

### E.    The Board's Initial Denial of the Plaintiff's Tenure

On August 22, 2012, Dr. Garcia wrote an official letter to Geras informing him that she planned to recommend him for tenure at the September 20, 2012 scheduled Board meeting.

According to Geras, he felt secure that the Board would approve Dr. Garcia's recommendation for tenure because, as a policy-making body, it is required to base such decisions on a fair evaluation of a candidate's performance. In this regard, Geras testified that "all [of his] indicators were superior performance" and were validated by "outstanding reviews" from the Board's own independent auditors.

On September 20, 2012, the Board convened a regularly scheduled meeting, the minutes of which are in the underlying record before the Court. The minutes reflect that a vote was taken to approve Dr. Garcia's recommendation of Geras for tenure. The motion failed, with one member voting in favor of tenure; three voting against; and one, namely, Cross, abstaining. Despite Cross's abstention from the initial tenure vote, Dr. Garcia testified that Cross likely played a significant role in the Board's decision to deny the motion.

Two days later, on September 22, 2012, a Saturday, the Board met in an emergency executive session and placed Geras on paid administrative leave, effective immediately. The testimony from Dr. Garcia suggests that the Board's decision to immediately place Geras on leave was highly unusual. In this regard, she testified that, by law, after the vote was taken to deny his tenure, the Plaintiff was entitled to retain his position for the remainder of his three-year probationary period, until the end of October 2012. However, according to Dr. Garcia, rather than allowing Geras to do so, the Board convened an emergency weekend meeting, which was attended by the District's attorney, for the express purpose of devising a strategy to immediately remove Geras from his position. She further testified that, during her entire employment with the District, she had never witnessed another employee be placed on administrative leave simply because they were denied tenure.

Cross acknowledged that this meeting was convened, but asserted that she could not recall what the emergency or the purpose of the meeting was.

Further, according to Garcia, this special Board session was unusual because she, as Superintendent, was not invited to attend. In this regard, she testified that personnel decisions are uniquely within the purview of the Superintendent's authority and that any decision to place an employee on administrative leave would have to have originated with a recommendation from her. In other words, the Board lacked authority to act on its own accord to place an employee on leave.

Cross testified consistently with Dr. Garcia, stating that, although the Superintendent does not attend every executive session of the Board, typically a resolution, presented by the Superintendent or her designee, is required in order for the Board to place an employee on administrative leave.

Nevertheless, Dr. Garcia did not make any such recommendation and is unaware of any person that did. At her deposition, Cross could not recall how the Board went about placing Geras on leave.

On or about September 25, 2012, the Board prepared a document addressed to the Plaintiff, entitled "Statutory Notice Pursuant to N.Y. Education Law § 3031(b)." The notice advised Geras that on September 20, 2012, the Board had rejected Dr. Garcia's recommendation to grant him tenure. The notice further stated that this vote was only advisory, and that a special meeting of the Board had been scheduled for October 29, 2012, at which a final determination on the Plaintiff's tenure would be made. The September 25 notice also advised Geras of his rights to demand a written statement of the Board's reasons for denying him tenure; and to submit his own statement responding to the Board's stated reasons.

On September 28, 2012, Geras made a written demand to the Board for a statement of reasons for its decision to deny him tenure.

On October 5, 2012, in response to Geras's demand, the Board issued a written response outlining the following six individual bases for its determination: (1) the Assistant Superintendent for Pupil Personnel Services, one Deborah DeLong, had written a memo concerning an alleged incident in which Geras displayed an "aggressive and accusatory" approach toward her, which allegedly gave the Board "concern about [his] conduct and [his] exercise of sound discretion in matters involving the District's personnel"; (2) as discussed above, Geras received a verbal warning regarding the comment he allegedly made to Ann DeLutri that Carlos Ramirez was "a touchy feely person because he is Latin"; (3) the Board allegedly found the incident in which Geras knocked on the ladies bathroom door looking for Annette Greer to constitute "appallingly bad judgment"; (4) as discussed above, Geras received a written warning from Dr. Garcia regarding an unauthorized "decision about benefits," which he had made outside of "the scope of [his] responsibility"; (5) allegedly, during contract negotiations with the teachers' union, Geras made "calculations and analys[e]s" which were "clearly erroneous and led to a breakdown in trust between the teacher's union's representatives and the School District," and which resulted in the union members voting down the contract; and (6) in August 2012, Board member Hobbs visited a school campus with the Plaintiff and identified necessary repairs which, apparently, the Plaintiff neither made nor arranged to have made.

On or about October 17, 2012, the Plaintiff prepared a ten-page written response to the Board's Statement of Reasons, specifically refuting the six enumerated bases for the Board's decision; declaring each to be "not credible"; and providing written remarks supporting his contentions. To the extent they are not more particularly discussed above, the Court briefly notes the following relevant disputes of fact, which are drawn from the Plaintiff's deposition testimony and are construed in his favor for purposes of this motion.

As to the complaint by Deborah DeLong, Geras testified that his demeanor, which she described as "aggressive and accusatory," was actually "professional" and "businesslike." On the date in question, Geras was the Acting Superintendent in Dr. Garcia's absence, and was responding to an urgent situation which required DeLong's assistance. Apparently, DeLong had failed to arrive for work as scheduled, and, after being unable to reach her by telephone, Geras was forced to travel with other members of the Business Department to her office to resolve the issue. He testified that he was "absolutely not" reprimanded for this incident and Dr. Garcia was in "total[ ] support of [his] actions."

As to the allegedly failed teachers' union negotiations, Geras testified that he, along with the District's labor counsel, and other members of the District's negotiating team, had effectively negotiated for each of the objectives given to them by then-President of the Board Charles Renfroe. However, before the negotiated terms could be voted on, Betty Cross was elected President of the Board. At that time, she made a series of demands that caused the negotiations to collapse, and the

District was seen as having reneged on the previously-negotiated agreement in principle. According to Geras, the teachers' union "absolutely" did not express displeasure with his conduct in this regard.

As to the alleged repairs that Geras failed to make on one of the District's schools, he testified that Hobbs's account of this was an "outright lie." Initially, Geras testified that neither Hobbs nor any other Board member has authority to direct an Assistant Superintendent to perform tasks such those described in the Board's statement of reasons. In any event, Geras stated that each of the specified repairs was made; and the true root of the problem was the custodian at the building – a relative of Hobbs – who had failed to perform his duties and was eventually transferred.

Of importance, at her deposition, Cross could not recall any of the reasons provided by the Board for denying Geras tenure. In this regard, she testified that it is usual for the Board to consider an applicant's performance reviews in voting on a tenure recommendation and that she believes Geras's performance as Finance Director was taken into account by the Board. However, she also testified that she does not remember Dr. Garcia giving the Plaintiff outstanding performance reviews; and that, although she is not familiar with the Standard and Poor's rating agency, she nevertheless doubts the accuracy of Dr. Garcia's July 11, 2012 memo attributing the District's financial stability to Geras. Further, despite testifying that she does not "keep up with all of those things," Cross suggested that Dr. Garcia's July 11th memo was fabricated and that the prior administration was solely responsible for

the District's financial condition. In this regard, Cross testified that Dr. Garcia "often did not tell [the Board] the truth," but was unable to identify another occasion when the Superintendent had been untruthful.

On or about October 18, 2012, Geras filed a third charge of discrimination with the NYSDHR, identifying each member of the Board as a responsible party. In this complaint, Geras asserted that the most recent act of discrimination had occurred on September 22, 2012; that he had been retaliated against after filing previous complaints of discrimination; and that, as retaliation for his prior complaints, the Board intended to terminate his employment at the October 29, 2012 scheduled meeting.

## F.   The Board's Final Denial of the Plaintiff's Tenure

The special meeting of the Board, which was originally scheduled for October 29, 2012, was adjourned to November 12, 2012. On that date, the Board convened for the purpose of making a final determination as to the Plaintiff's tenure. The minutes of this meeting, which are in the underlying record before the Court, reflect that a second vote was taken to approve the Board's prior denial of Geras's tenure and to terminate his employment. The following motion was carried, with four members, including Cross, voting in favor, and one voting against:

> **RESOLVED**, that the Board of Education, at a special meeting of the Board, on November 12, 2012, pursuant to N.Y. Education Law § 3031(b), rejects the recommendation of the Superintendent to grant Robert Geras tenure and has made a final decision to terminate Robert Geras' employment with the School District effective 11:50 p.m. on November 12, 2012[.]

In support of the instant motion, Board members Waylyn Hobbs, JoAnn Simmons, and Shelley Brazley, each of whom, together with Cross, voted to deny Geras tenure, submitted identical affidavits stating that Geras's complaints of discrimination to the NYSDHR played no role in their decision making. Rather, each of them stated that their decision was based solely on the incident where Geras allegedly knocked on the ladies bathroom door looking for Annette Greer.

The Court notes that each member of the Board also testified that Betty Cross had not influenced their vote on any issue; and that none of their votes has been cast based on race, ethnicity, or national origin. In particular, JoAnn Simmons stated that, although "[t]here were always complaints coming in about Mr. Geras," the Annette Greer incident "was wrong" and she "just could not see having a male that is going into the ladies room for no reason." The Court notes that Simmons testified that Betty Cross had campaigned for her reelection to the Board in 2013. Cross also acknowledged campaigning for Brazley's election to the Board.

Further, Hobbs testified that he voted against the Plaintiff's tenure "based on several complaints received from employees of the school district," including the one from Annette Greer. He also noted the allegedly poor overall physical conditions of the school district, the maintenance of which was Geras's responsibility. He claims to have had several conversations with Geras about his concerns before voting against tenure. However, the Court notes that Betty Cross is Hobbs's godmother and served as his Campaign Manager when he ran for a seat on the Board.

Dr. Garcia disputed the Board members' assertions in this regard, testifying that she believed the Plaintiff's termination was "illegal" and was "definitely" motivated by his race and his prior complaints of discrimination. The Court notes that the Plaintiff was replaced by one Gerard Antoine, an African-American individual who was previously supervised by Geras.

Geras testified that he currently is employed as the facilities manager at Fordham University, making approximately $60,000 per year less than what he earned in his previous position with the District.

## G. Additional Facts – The Plaintiff's Prior Employment by Elmont Union Free School District

Prior to obtaining his position with the District, Geras was the Director of Business and Facilities for the Elmont Union Free School District ("Elmont"). The Defendants submit evidence relating to the Plaintiff's prior employment, as well as evidence relating to a purported post-termination lawsuit that he filed against Elmont. The Court has reviewed this evidence and finds that it lacks any relevance to the substantive questions in this case, and is probative only to the extent that the Defendants characterize Geras as a "serial litigator."

## H. Summary of the Plaintiff's Claims

On September 12, 2013, Geras commenced this action against the Defendants, alleging the following causes of action:

(1) Racial discrimination against the District, the Board, and Betty Cross, individually, in violation of Title VII and the NYSHRL;

(2) Discriminatory Retaliation against the District, the Board, and Betty Cross, individually, in violation of Title VII and the NYSHRL;

(3)     Hostile work environment against the District, the Board, and Betty Cross, individually, in violation of Title VII and the NYSHRL;

(4)     Aiding and abetting unlawful discrimination and retaliation against Betty Cross, individually, in violation of the NYSHRL; and

(5)     Violation of the Fourteenth Amendment right to equal protection, as a result of unlawful discrimination, retaliation, and hostile work environment, against the District, the Board, and Betty Cross, individually, in violation of § 1981 and § 1983.

Before turning to a legal discussion of these claims, the Court makes a few preliminary observations.

First, the complaint does not clearly indicate whether Geras is asserting direct claims for racial discrimination, retaliation, and hostile work environment under Title VII against Betty Cross, individually. However, this question is of no moment, because there is no individual liability under Title VII. See Hines v. City of New York, No. 97-7865, 1998 U.S. App. LEXIS 20180, at *5 (2d Cir. June 23, 1998); Johnson v. County of Nassau, 10-cv-6061, 2014 U.S. Dist. LEXIS 133175, at *27-*28 (E.D.N.Y. Sept. 22, 2014); Hodge v. City of Long Beach, 07-cv-4084, 2010 U.S. Dist. LEXIS 138344, at *31 (E.D.N.Y. Dec. 28, 2010). Accordingly, to the extent the Plaintiff asserts direct claims against the individual Defendant Betty Cross under Title VII, the Court grants summary judgment in her favor, and those claims are dismissed.

Second, although the complaint clearly alleges individual liability against Cross under the NYSHRL for aiding and abetting unlawful conduct, it is unclear whether the Plaintiff is also alleging direct claims against Cross for racial

discrimination, retaliation, and hostile work environment under that statute. In this regard, the Court notes that, unlike Title VII, the NYSHRL provides for direct individual liability for discriminatory acts by individuals who, like Cross, have power over personnel decisions. See Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995); Berlyavsky v. N.Y. City Dep't of Envtl. Prot., 14-cv-3217, 2015 U.S. Dist. LEXIS 133647, at *37-*38 (E.D.N.Y. Aug. 28, 2015); Barella v. Vill. of Freeport, 16 F. Supp. 3d 144, 156-57 (E.D.N.Y. 2014) (Spatt, J.); EEOC v. Suffolk Laundry Servs., Inc., 48 F. Supp. 3d 497, 523-25 (E.D.N.Y. Oct. 1, 2014).

Mindful that, at the summary judgment stage, all ambiguities and inferences must be resolved in favor of the non-moving party, for purposes of this motion, the Court will construe the complaint to assert the following claims against Cross, individually, under the NYSHRL: (1) under a theory of direct liability, claims for racial discrimination, retaliation, and hostile work environment; and (2) claims for aiding and abetting the District's discriminatory and retaliatory conduct.

Third, the Plaintiff's "employment discrimination claims under § 1981 are subsumed within [his] claims under § 1983, which is the vehicle for enforcing those rights." McKinney v. Bennett, 06-cv-13486, at *12 n.1 (S.D.N.Y. Sept. 16, 2009); see Hill v. City of New York, 13-cv-6147, 2015 U.S. Dist. LEXIS 130928, at *24 (E.D.N.Y. Sept. 28, 2015) ("[W]hen the defendant sued for discrimination in violation of § 1981 is a municipality or individual sued in his official capacity, § 1983 supplies the exclusive remedy for violation of rights guaranteed under § 1981"); Gilbert v. Dep't of Corr., 10-cv-1877, 2014 U.S. Dist. LEXIS 161476, at *9-

*10 (D. Conn. Nov. 18, 2014) ("The express cause of action for damages created by § 1983 constitutes the *exclusive* federal remedy for violation of the rights guaranteed by § 1981 by state governmental units. When a state employee seeks to hold an individual fellow state employee liable in damages for violation of § 1981 rights, such claim must also be pursued under the remedial provisions of § 1983" (emphasis in original) (internal quotation marks and citation omitted)); <u>Zaniewska v. City of New York</u>, 11-cv-2446, 2013 U.S. Dist. LEXIS 109918, at *28-*29 (E.D.N.Y. Aug. 5, 2013) ("[W]here defendants are state actors, Section 1983, not Section 1981, is the appropriate vehicle through which a plaintiff may pursue discrimination claims for damages"), <u>aff'd</u>, 569 F. App'x 39 (2d Cir. 2014). Accordingly, although not specifically pled as such, the Plaintiff's § 1981 and § 1983 claims will be discussed collectively in this opinion.

On July 2, 2015, the Defendants filed the instant motion, pursuant to Fed. R. Civ. P. 56, seeking summary judgment and dismissal of the complaint. For the reasons that follow, the motion is granted in part and denied in part.

## II.  Discussion

### A.  The Applicable Legal Standards

#### 1.  Summary Judgment under Fed. R. Civ. P. 56

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving

40

party.' " <u>Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.</u>, 150 F.3d 132, 137 (2d Cir. 1998) (quoting <u>Garza v. Marine Transp. Lines, Inc.</u>, 861 F.2d 23, 26 (2dCir. 1998)).

" '[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " <u>Redd v. N.Y. State Div. of Parole</u>, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

Further, in discrimination cases, "[d]istrict courts are cautious about granting summary judgment when intent is at issue since 'a victim of discrimination . . . is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.' " <u>Martin v. State Univ. of New York</u>, 704 F. Supp. 2d 202, 220 (E.D.N.Y. 2010) (quoting <u>Rosen v. Thornburgh</u>, 928 F.2d 528, 533 (2d Cir. 1991)). Nevertheless, " 'even in the fact-intensive context of discrimination cases,' '[i]t is now beyond cavil that summary judgment may be appropriate.' " <u>EEOC v. Bloomberg, L.P.</u>, 967 F. Supp. 2d 816, 830 (S.D.N.Y. 2013) (quoting <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir 2001), <u>cert. denied</u>, 534 U.S. 993, 122 S. Ct. 460, 151 L. Ed. 2d 105 (2000)). As one district court in this District noted:

> [A]lthough courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question, and should carefully scrutinize affidavits and depositions for circumstantial proof that, if believed, would show discrimination, a plaintiff must provide more than

conclusory allegations of discrimination to defeat a motion for summary judgment.

Slattery v. Peerless Imps., Inc., 04-cv-0275, 2005 U.S. Dist. LEXIS 12830, at *10 (E.D.N.Y. June 29, 2005) (internal citation and quotation marks omitted); see also Bloomberg, 967 F. Supp. 2d at 831 ("[A] plaintiff alleging discrimination claims 'cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts . . . or defeat the motion through mere speculation or conjecture.'" (quoting Jones v. Hirschfeld, 348 F. Supp. 2d 50, 59 (S.D.N.Y. 2004)); Martin, 704 F. Supp. 2d at 220 ("Even in the discrimination context, . . . a plaintiff 'must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment'" (quoting Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)).

## B. The Plaintiff's Claims of Racial Discrimination under Title VII and NYSHRL

The Plaintiff brings claims of racial discrimination under Title VII against the District and the Board. He also brings claims of racial discrimination under the NYSHRL against the District, the Board, and Betty Cross, individually. For the reasons that follow, the Defendants' motion for summary judgment dismissing these claims is denied.

### 1. The Standard of Review

At the summary judgment stage, these claims are evaluated using a common analytical framework, namely, the burden-shifting test announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See

Simmons v. Akin Gump Strauss Hauer & Feld, LLP, 508 F. App'x 10, 12 (2d Cir. 2013); Jackson v. City of New York, 29 F. Supp. 3d 161, 170-71 (E.D.N.Y. 2014); Zagaja v. Vill. of Freeport, 10-cv-3660, 2012 U.S. Dist. LEXIS 170484, at *44-*45 n.6 (E.D.N.Y. Nov. 20, 2012); Kantrowitz v. Uniondale Union Free Sch. Dist., 822 F. Supp. 2d 196, 215 n.13 (E.D.N.Y. 2011).

Under this legal standard, the Plaintiff is first required to establish a prima facie case of discrimination. This involves demonstrating that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. See Wright v. City of Syracuse, 611 F. App'x 8, 11 (2d Cir. 2015); Welsey-Dickson v. Warwick Valley Cent. Sch. Dist., 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013); see also Placide-Eugene v. Visiting Nurse Serv. of N.Y., 86 F. Supp. 3d 132, 14-45 (E.D.N.Y. 2015) (Spatt, J.) (noting that the burden of establishing a prima facie Title VII case is "de minimis").

"If the plaintiff meets the minimal burden of establishing a prima facie case, the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action." Welsey-Dickson, 973 F. Supp. 2d at 397 (citing McDonnell Douglas, 41 U.S. at 802-03). The Defendants' burden at this stage has been described as "light," and the employer is required to "simply articulate an explanation that, if true, would connote lawful behavior.' " Penberg v. HealthBridge Mgmt., 823 F. Supp. 2d 166, 176 (E.D.N.Y. 2011) (quoting Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998)); see Sethi v.

_Narod_, 12 F. Supp. 3d 505, 522 (E.D.N.Y. 2014) (noting that the Defendants' burden at this stage "is not a particularly steep hurdle"; it is "one of production, not persuasion" and "can involve no credibility assessment" (internal citations omitted)). In this regard, district courts may not " 'second-guess an employer's non-discriminatory business decisions, regardless of their wisdom.' " _Kennebrew v. N.Y. City Hous. Auth._, 01-cv-1654, 2002 U.S. Dist. LEXIS 3038, at *51 (S.D.N.Y. Feb. 26, 2002) (Report and Recommendation), _adopted_, 2002 U.S. Dist. LEXIS 29293 (S.D.N.Y. July 8, 2002) (quoting _Williams v. N.Y.C. Dep't of Sanitation_, 00-cv-7371, 2001 U.S. Dist. LEXIS 15594, at *63 (S.D.N.Y .Sept. 28, 2001)); _see, e.g._ _Yu v. N.Y. City Hous. Dev. Corp._, 494 F. App'x 122, 125 (2d Cir. 2012) (declining to second-guess an employer's articulated reasons for not promoting an employee); _Stern v. Trustees of Columbia Univ._, 131 F.3d 305, 313 (2d Cir. 1997) (noting that courts "do not second-guess an employer's hiring standards").

At the next step, "[i]f the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." _Welsey-Dickson_, 973 F. Supp. 2d at 397. In this regard, the relevant inquiry is not whether the Defendants' articulated performance-based justifications for the adverse employment action were accurate or fair. _See Sethi_, 12 F. Supp. 3d at 547 (quoting _Miller v. Nat'l Assoc. of Sec. Dealers, Inc._, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010)). Rather, "[t]o avoid

summary judgment, [the] Plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that racial . . . discrimination played a role in the adverse action taken by Defendant[s]." Id. at 548; see Rubinow v. Boehringer Ingelheim Pharms., Inc., 496 F. App'x 117, 118-19 (2d Cir. 2012) (same). Stated otherwise, the Plaintiff need not prove that the Defendants' proffered reasons were false or played no role in the employment decision, only that the prohibited factor, namely his race, was at least one motivating factor leading to his termination. See Sethi, 12 F. Supp. 3d at 547 (quoting Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008)).

## 2. Application

### a. Prima Facie Case of Discrimination

For purposes of this motion, the Defendants do not dispute that Geras was qualified for his position, although they assert in their supporting legal memorandum that they "question his performance." Further, the Defendants do not dispute that the Plaintiff's denial of tenure and subsequent termination constitute adverse employment actions within the meaning of Title VII. The Defendants do contend that Geras, as a white male, is not a member of a protected group, and that his termination did not arise under circumstances indicative of discrimination. The Court disagrees.

First, the law is clear that Title VII protects plaintiffs from discrimination on the basis of being white. See, e.g., Barella v. Vill. of Freeport, 16 F. Supp. 3d 144, 159-61 (E.D.N.Y. 2014) (Spatt, J.); Sullivan v. Newburgh Enlarged Sch. Dist., 281

F. Supp. 2d 689, 703 (S.D.N.Y. 2003) (citing McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 286-87, 49 L. Ed. 2d 493, 96 S. Ct. 2574 (1976)).

Second, viewing the evidence in the light most favorable to the Plaintiff, the Court finds the record sufficient to support a reasonable inference of racial discrimination. In this regard, the standard is flexible and can be satisfied "differently in differing factual scenarios." Sethi, 12 F. Supp. 3d at 536 (quoting Howard v. MTA Metro-N. Commuter R.R., 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011)). For example, such an inference "can be drawn from circumstances such as the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse employment action]." Id. (quoting Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2011) (internal quotation marks omitted)).

In this case, there is evidence that Cross was a decision maker for the District, with power over administration-level personnel decisions. There is also evidence that Cross personally disliked Geras, at least in part, because he is Caucasian and had been hired instead of an African-American candidate that she had preferred. In this regard, the testimonial evidence indicates that Cross had "made it clear" to the Superintendent that the District should exclusively hire African-Americans; that "Hempstead belong[s] to African-Americans"; and that she was on the Board to "take care of black people."

There is also evidence that, over the approximately three years that Geras was employed by the District, Cross made several disparaging comments about Caucasians, generally, and about the Plaintiff, in particular. For example, there is evidence that Cross directed racially-charged statements at Geras, such as calling him a "white boy," a "white racist," and a "no good white man." There is evidence that Cross told the Plaintiff that he did not "understand African-Americans"; that she did not want him in the District; and that she "wanted [him] replaced with an African-American." More troubling, there is evidence that Cross threatened to "destroy" the Plaintiff and have the Hempstead community "lynch" him.

Although Cross denied making these statements and other similar remarks, the Court will assume that they were made for purposes of analyzing whether they raise an inference of discrimination. See Sethi, 12 F. Supp. 3d at 538 (citing Crump v. NBTY, Inc., 847 F. Supp. 2d 388, 395 (E.D.N.Y. 2012)). This assumption is reasonable in light of the undisputed fact that, at some point prior to Cross being elected President, the Board appointed a special investigative counsel to address allegations of harassment, threats, and racial discrimination by her.

Further, although the Defendants characterize this evidence as mere "stray remarks," the record indicates otherwise. There is testimonial evidence that Geras was "harassed [and] belittled on a daily basis" by Cross, and that he complained to his supervisor "all the time," but that the District took no action in response. In this regard, the Plaintiff testified that Cross "degraded," "berated," and "told lies about" him, including that he mismanaged the District's budget. In this regard,

there is evidence that Cross publicly criticized and disparaged the Plaintiff's job performance, despite testifying at her deposition that she was not personally knowledgeable about relevant aspects of the District's financial condition, and was not aware of positive performance evaluations from the Superintendent.

Further, in the Court's view, a reasonable jury could draw an inference of racial discrimination from the sequence of events leading to the Plaintiff's termination. The evidence shows that two days after Geras formally complained to both the District and the NYSDHR, Cross made a racially-charged cross-complaint, in which she asserted her opinion that the Plaintiff lacked respect for African-American women and had spoken to her as if she was "a nobody." Approximately one month later, at the next scheduled Board meeting, there is evidence to suggest that Cross had improperly coordinated with an African-American Assistant Superintendent to introduce a resolution that would force Geras's resignation, after which he filed a second charge of discrimination with the NYSDHR. Further, the evidence indicates that, months later, contrary to a recommendation from the Superintendent, the Board voted to deny tenure to the Plaintiff.

In this regard, the Defendants contend that any potential inference of discrimination is undermined by the fact that three members of the Board, other than Betty Cross, voted to deny tenure to the Plaintiff. However, in the Court's view, this argument fails to account for the undisputed fact that each of the voting members of the Board was, in one way or another, closely associated with Betty Cross. For example, Cross is Waylyn Hobbs's godmother and campaign manager.

Also, there is evidence that Shelley Brazley and JoAnne Simmons secured their seats on the Board, at least in part, through campaign efforts by Betty Cross.

It is true that each of these individuals testified that they were motivated to terminate the Plaintiff solely by Annette Greer's June 14, 2010 complaint that Geras had followed her into a female restroom; not by his race. However, in the Court's view, based on all of the evidence in the record, a reasonable jury could conclude otherwise.

In this regard, the jury is entitled to consider whether, in September 2012, it was more likely that the Board was motivated by Cross's alleged racial bias, as outlined in the March 2012 complaint, than by the Annette Greer incident, which had occurred two years earlier; resulted in no discernible disciplinary action; and arose from facts which are placed in dispute by the Board members' own sworn statements. See Dunaway v. MPCC Corp., 12-cv-7609, 2015 U.S. Dist. LEXIS 94022 (S.D.N.Y. July 16, 2015) ("Inconsistency can evidence pretext" (citing Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013)); see also Claudio v. Mattituck-Cutchogue Union Free Sch. Dist., 955 F. Supp. 2d 118, 140 (E.D.N.Y. 2013) ("It is well-settled that a plaintiff, in conjunction with other evidence, may demonstrate pretext in a discrimination case by pointing to 'weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-discriminatory reasons for its action' ") (quoting Shannon v. Fireman's Fund Ins. Co., 156 F. Supp. 2d 279, 291 (S.D.N.Y. 2001)).

In the Court's view, a reasonable inference of discrimination may also be drawn from the undisputed fact that, although Betty Cross abstained from the Board's September 2012 advisory vote, she convened an emergency executive session two days later in order to place Geras on immediate administrative leave. It is undisputed that this meeting was held on a Saturday, without the Superintendent present, and without any recommendation for placing the Plaintiff on leave. There is evidence that this was a procedurally unusual Board meeting. In fact, Dr. Garcia testified that, during her entire employment with the District, she had never witnessed another employee having been placed on administrative leave simply because they were denied tenure. At her deposition, Cross could not provide an explanation for these procedural irregularities. See Desir v. Bd. of Coop. Educ. Servs. (BOCES), 803 F. Supp. 2d 168, 177 (E.D.N.Y. 2011), aff'd, 469 F. App'x 66 (2d Cir. 2012) ("In certain circumstances, procedural irregularities may form a basis to infer discriminatory animus").

In this regard, even if, as the Defendants contend, the record is lacking evidence that any voting Board member other than Betty Cross harbored racial animus, summary judgment is not appropriate. The Court is persuaded by the Second Circuit's opinion in Back v. Hastings on Hudson Union Free School District, 365 F.3d 107, 125-26 (2d Cir. 2004). In that case, the court held that "'impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to

have the impermissible bias played a meaningful role in the . . . process' " (quoting Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir. 1999)).

Guided by this principle, the Court is of the view that there is ample evidence to raise an inference that Betty Cross harbored an improper bias against the Plaintiff on the basis of his Caucasian race, and, that, through her singular influence on the Board, she played a meaningful role in the decision-making process at it related to his tenure. In this regard, the testimonial evidence indicates that, at all relevant times, Betty Cross was the most powerful member of the Board, and had, on numerous occasions, "dominated" the Board and "bullied" its other members to vote in accordance with her views. There is also evidence that Cross had, on occasion, threatened to rally the community behind her; lead marches in the streets of Hempstead; and, as noted above, incite the community to "lynch" the Plaintiff.

Further, it is undisputed that, following his termination, Geras was replaced with an African-American employee in his department – a fact which may be sufficient to discharge his minimal burden under the first prong of the McDonnell Douglas test. See, e.g., Tarshis v. Riese Org., 211 F.3d 30, 36 (2d Cir. 2000) (noting that the final prong of a prima facie Title VII case may be satisfied by a showing that the plaintiff "was replaced by someone outside his protected class").

Under these circumstances, the Court finds that the Plaintiff has satisfactorily established a prima facie case of racial discrimination, thereby shifting the burden of proof to the Defendants to demonstrate legitimate, non-discriminatory reasons for their adverse employment action.

### b. Legitimate, Non-Discriminatory Reasons

The Defendants have carried their light burden of articulating an explanation for the Plaintiff's termination which, if true, would connote lawful behavior. In particular, the Court is satisfied that the Board's October 5, 2012 written statement of its reasons for voting to deny Geras tenure, see supra at 32, is sufficient to shift the burden back to the Plaintiff to establish that those reasons were actually a pretext for racial discrimination.

### c. Pretext

The burden of establishing is pretext is higher than that required to establish a prima facie case of discrimination. See John v. Kingsbrook Jewish Med. Ctr., 11-cv-3624, 2014 U.S. Dist. LEXIS 39322, at *51-*52 (E.D.N.Y. Mar. 25, 2014), aff'd, 598 F. App'x 798 (2d Cir. 2015). However, it is well-settled that a Title VII plaintiff may rely on the same evidence to establish pretext as he used to support his prima facie case. See Kerzer v. Kingly Mfg., 156 F.3d 396, 402 (2d Cir. 1998); Koontz v. Great Neck Union Free Sch. Dist., 12-cv-2538, 2014 U.S. Dist. LEXIS 72082, at *13 (E.D.N.Y. May 27, 2014); Bagley v. J.P. Morgan Chase & Co., 10-cv-1592, 2012 U.S. Dist. LEXIS 97045, at *34-*35 (S.D.N.Y. July 12, 2012) (collecting cases).

Construing the record in the light most favorable to the Plaintiff, the Court finds that there is a sufficient evidentiary basis, as outlined above, for a reasonable trier of fact to doubt the Defendants' proffered reasons for termination and ultimately find that racial bias was at least a motivating factor behind the Board's employment decisions relating to Geras. In this regard, in addition to the

discussion set forth above, the Court notes that, at her deposition, Cross could not recall any of the non-discriminatory reasons proffered by the Board for terminating the Plaintiff. Nor could she recall relevant facts relating to the Plaintiff's job performance, despite conceding that tenure decisions are usually made based on performance evaluations and similar evaluative tools. In this regard, Cross could not recall the Plaintiff receiving outstanding performance evaluations from the Superintendent; she denied receiving a memorandum which highlighted Geras's success in bolstering the District's finances; and she denied any knowledge of the Standard and Poor's rating agency, which provided an objective metric for assessing his job performance. In fact, despite testifying that she does not "keep up with all of those things," Cross discredited the Superintendent's assessment of Geras's job performance as being fabricated and self-aggrandizing, and accused Dr. Garcia of often being dishonest

However, at her deposition, Cross testified that she believed the Plaintiff had used the "N word" and asserted, as she had in her March 2012 cross-complaint, that he lacked respect for black women. Coupled with her inability to recall any performance-based reasons for termination, and taken together with the totality of the circumstances described above, the Court finds the evidence sufficient to allow a reasonable jury to conclude that the Board's proffered non-discriminatory reasons for terminating the Plaintiff were not the only reasons, and that racial bias was a motivating factor.

Accordingly, the Court denies the Defendants' motion for summary judgment to the extent it seeks to dismiss the Plaintiff's claims against the District and the Board based on racial discrimination under Title VII. The Court also denies the Defendants' motion for summary judgment to the extent it seeks to dismiss the Plaintiff's claims against all of the Defendants based on racial discrimination under the NYSHRL.

## C.    The Plaintiff's Claims of Retaliation under Title VII and the NYSHRL

The Plaintiff brings claims of retaliation under Title VII against the District and the Board. He also brings claims of retaliation under the NYSHRL against the District, the Board, and Betty Cross, individually. In particular, the Plaintiff claims that he was terminated as retaliation for two discrete protected activities: (1) filing the March 21, 2012 charge of discrimination with the NYSDHR; and (ii) filing a written complaint to the District about Cross's alleged discriminatory conduct. For the reasons that follow, the Defendants' motion for summary judgment dismissing these claims is denied.

### 1.    The Standard of Review

"The anti-retaliation provisions in Title VII . . . and the NYSHRL [ ] contain nearly identical language and are governed by the same burden-shifting analysis." Wesley-Dickson, 973 F. Supp. 2d at 407 (citing Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999); Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013)). In particular, at the summary judgment stage, the Plaintiff's retaliation claims are governed by the

McDonnell Douglas burden-shifting framework, discussed above. See id.; see also Johnson, 2014 U.S. Dist. LEXIS 133175, at *37.

At first, this entails a prima facie showing that: (1) the Plaintiff was engaged in a protected activity; (2) that the Defendants were aware of that activity; (3) that the Plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. See id. at *37-*38 (citing Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013)).

As to the fourth element of the prima facie case, an inference of retaliation "may be demonstrated either: '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.' " Spaulding v. N.Y. City Dep't of Educ., 12-cv-3041, 2015 U.S. Dist. LEXIS 127076, at *154 (E.D.N.Y. Feb. 19, 2015) (Report and Recommendation), adopted, 2015 U.S. Dist. LEXIS 126292 (E.D.N.Y. Sept. 21, 2015).

Similar to his discrimination claims, "[i]f the plaintiff establishes a prima facie case of retaliation, then the burden shifts to the defendant-employer to provide a legitimate, non-retaliatory reason for its actions." Id. at *38. Where the Defendant articulates legitimate, non-retaliatory reasons for its employment decision, "then the presumption of retaliation dissipates," Weber v. City of New York, 973 F. Supp. 2d 227, 265 (E.D.N.Y. 2013), and the burden shifts back to the

plaintiff to show that the employer's explanation is actually a pretext for illegal retaliation, see Johnson, 2014 U.S. Dist. LEXIS 133175, at *38 (quoting Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014)).

Relevant here, the Supreme Court has instructed that "retaliation claims under Title VII 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.' " Batchelor v. City of New York, 11-cv-2028, 2014 U.S. 46921, at *136-*137 (E.D.N.Y. Feb. 16, 2014) (Report and Recommendation), adopted, 12 F. Supp. 3d 458 (E.D.N.Y. 2014) (quoting Univ. of Tex. Southwestern Med. Ctr. v. Nassar, __ U.S. __, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013)). However, "[r]equiring proof that a prohibited consideration was a 'but-for' cause of an adverse action does not equate to a burden that such consideration was the 'sole' cause." Id. at *137 (quoting Kwan, 737 F.3d at 846 n.5). Stated differently, " 'a plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability.' " Id. (quoting Kwan, 737 F.3d at 846 n.5); see Johnson, 2014 U.S. Dist. LEXIS 133175, at *39 ("[B]ut-for causation does not require proof that that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the of the retaliatory motive" (internal quotation marks and citation omitted)).

The "but-for" causation standard for Title VII claims applies with equal force to retaliation claims under the NYSHRL.  See Batchelor, 2014 U.S. 46921, at *137-*138 (collecting cases).

### 2.    Application

#### a.    The Prima Facie Case of Retaliation

For purposes of this motion, the Defendants concede the first three elements of the Plaintiff's prima facie case, namely, that he was engaged in a protected activity; that they had knowledge of the activity; and that he suffered an adverse employment action.

However, the Defendants contend that the Plaintiff's prima facie case fails, as a matter of law, because there is insufficient evidence of a causal nexus between the Plaintiff's complaints of discrimination and his subsequent termination.  In particular, the Defendants advance three related arguments:  (1) the six-month period of time between Geras's March 2012 complaints and his November 2012 termination is too lengthy to support an inference of retaliation; (2) the Board's actions, namely, its votes at the September 20, 2012 and October 29, 2012 meetings were taken in response to the Superintendent's recommendation that Geras be granted tenure, not in response to his complaints; and (3) the Plaintiff cannot establish "but-for" causation because he alternatively asserts in this litigation that the cause of his termination was the Defendants' racial bias.  The Court finds that these contentions are without merit.

Initially, the Court notes that "[e]vidence of temporal proximity alone is sufficient to establish an inference of retaliation for purposes of a prima facie case." Spaulding, 2015 U.S. Dist. LEXIS 127076, at *155 (citing El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010)). Although the Second Circuit has not established a bright line rule for when protected activity is too temporally remote to demonstrate a causal connection, see id., there is authority for the Defendants' contention that "[s]ix months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation," Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) (citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)).

However, the Court finds the Defendants' argument to be unavailing because the Plaintiff in this case does not rely on timing alone to establish a prima facie case. Rather, the totality of the circumstances of this case, including the timing of Geras's termination, supports a reasonable inference of discriminatory retaliation. See Summa v. Hofstra Univ., 708 F3d 115, 128 (2d Cir. 2013) (holding that "the combination of reasonably close temporal proximity and the particular context in [that] case [was] sufficient to infer causation in establishing a prima facie case of retaliation regarding the termination").

In this regard, the Court is persuaded by the Second Circuit's opinion in Espinal v. Goord, 558 F.3d 119 (2d Cir. 2009). In Espinal, an inmate in a New York correctional facility alleged that prison workers had used excessive force against him and denied him medical treatment in retaliation for prior lawsuits that

the plaintiff had filed. The district court found that the plaintiff failed to show a causal connection between his protected activity and the alleged retaliation, emphasizing that approximately one and a half years had elapsed between the two events. However, the Second Circuit reversed that finding, noting that principles of temporal proximity should not be applied so rigidly to defeat retaliation claims. In particular, the court held that its reluctance to define a bright line test for temporal proximity allows courts "to exercise [their] judgment about the permissible inferences that can be drawn from temporal proximity *in the context of particular cases*" (emphasis supplied).

The court in the Espinal case reasoned as follows:

> Here, we find the passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers, one of whom . . . was a defendant in the prior lawsuit, is sufficient to support an inference of a causal connection. It is plausible that the officers waited to exact their retaliation at an opportune time – as when Espinal was involved in a fight with another inmate – in order to have a ready explanation for any injuries suffered by Espinal.

(internal citation omitted).

The Court finds this analysis to be directly applicable to the facts in this case. In particular, contrary to the Defendants' contentions, it would be misguided to take an isolated view of the six-month gap between the Plaintiff's protected activity and the Board's allegedly retaliatory vote, without appropriate regard for the balance of the evidence in the record and the unique context of this case.

In the Court's view, there is ample evidence to allow a reasonable jury to conclude that the Board's September 20, 2012 vote to deny tenure to Geras was in

retaliation for his formal complaints and charge of discrimination six months earlier. In this regard, the jury is entitled to consider the uncontroverted evidence that immediately after the Plaintiff filed a formal complaint to the District, Cross filed a cross-complaint, which asserted that Geras did not display appropriate respect toward African-American women. The jury is also entitled to assess the credibility of Cross's testimony that she was unaware of Geras's complaint when she filed her own cross-complaint.

Further, the Court is particularly wary of focusing too narrowly on temporal proximity in this case because the Board of Education has limited opportunities to act in an official capacity, namely, at public meetings and executive sessions, which usually are convened on a monthly basis. Thus, as was the case in Espinal, the Court finds the Plaintiff's contention to be plausible that the Board waited to exact its retaliation against him at an opportune time, namely, a regularly-scheduled Board meeting at which his recommendation for tenure was presented for a vote. On the present record, a reasonable jury could conclude that the Board did so "in order to have a ready explanation" in the event that its actions were called into question in, for example, a federal discrimination lawsuit.

Further weighing against strict reliance on temporal proximity is the evidence that Cross had unsuccessfully attempted to take adverse employment action against Geras well before the September 20, 2012 vote, namely, on April 19, 2012, at the first scheduled Board meeting following the protected activity. In the Court's view, the jury is entitled to consider the relevant surrounding

circumstances, including the testimonial and video evidence that, one month after the Plaintiff lodged his complaints of discrimination, Cross attempted to introduce a resolution that would force his resignation. In this regard, the jury is also entitled to consider the Board's irregular activities immediately following its vote to deny tenure to the Plaintiff, including placing him on administrative leave during a weekend meeting without the Superintendent present. The Court finds that this evidence provides a relevant and necessary context for any inferences that may ultimately be drawn from the length of time between the Plaintiff's protected activity and his termination.

Under these circumstances, the Court finds the Defendants' reliance on the temporal proximity between the Plaintiff's protected activity and his termination to be an insufficient basis for granting summary judgment.

For substantially the same reasons, the Court rejects the Defendants' second contention, namely, that the Board's actions were properly taken in response to the Superintendent's recommendation that Geras be granted tenure, and not in response to his complaints of discrimination. As previously noted, there is ample evidence to allow a reasonable jury to conclude that Dr. Garcia's recommendation presented a convenient opportunity for the Board to exact retaliation against the Plaintiff, while maintaining a plausible denial as to its motives.

Lastly, the Defendants contend that the Plaintiff cannot establish the requisite "but-for" causation. In this regard, the Defendants argue that Geras cannot simultaneously assert that: (i) his termination was caused by racial bias;

and also (ii) his termination was caused by his protected activity. However, as noted above, this position is contrary to the controlling case law in this Circuit, which holds that an adverse employment action can have multiple "but-for" causes, each one of which may be sufficient to support liability. See Kwan, 737 F.3d at 846 n.5; Krause v. Eihab Human Servs., 10-cv-898, 2015 U.S. Dist. LEXIS 101820, at *29 (E.D.N.Y. Aug. 4, 2015); Holleman v. Art Crating Inc., 12-cv-2719, 2014 U.S. Dist. LEXIS 139916, at *147 (E.D.N.Y. Sept. 30, 2014); Batchelor, 2014 U.S. 46921, at *137; Zagaja, 2012 U.S. Dist. LEXIS 170484, at *49-*50.

As the Defendants suggest, it is self-evident that the Board was compelled to vote, one way or another, on the Superintendent's recommendation of Geras for tenure. However, this fact does not suffice to defeat causation. On the record before it, the Court is of the view that a reasonable jury could conclude that the adverse result of the vote, namely, denial of tenure and termination, would not have occurred but for the Plaintiff's protected complaints of discrimination.

Based on the foregoing, the Court finds that the Plaintiff has satisfied his minimal burden of establishing a prima facie case of retaliation, thereby shifting the burden to the Defendants to articulate legitimate, non-retaliatory reasons for their adverse employment action.

**b.  Legitimate, Non-Retaliatory Reasons**

For the same reasons as outlined above, the Court finds that the Defendants' reliance on the Board's October 5, 2012 statement of its reasons for voting to deny Geras tenure is sufficient to carry their burden of articulating a non-retaliatory

explanation for the Plaintiff's termination. Thus, again, the burden shifts back to the Plaintiff to establish that those reasons were actually a pretext for unlawful retaliation.

### c.    Pretext

Here, again, the Court invokes the principle, discussed above, that a Title VII plaintiff may use the same evidence to establish pretext as he uses to support his prima facie case.

Accordingly, for the reasons set forth more fully above, the Court again finds that the evidence, when construed in the light most favorable to the non-moving party, is sufficient to warrant denial of the summary judgment motion. In particular, the totality of the circumstances – in which the temporal proximity between the protected activity and the termination is one consideration – is such that a reasonable trier of fact could conclude, by a fair preponderance of the evidence, that notwithstanding the non-retaliatory reasons proffered by the Defendants, the Plaintiff would not have been terminated if not for his earlier complaints of discrimination at the hands of Betty Cross.

Therefore, the Court denies the Defendants' motion for summary judgment to the extent it seeks to dismiss the Plaintiff's claims against the District and the Board based on retaliation under Title VII. The Court also denies the Defendants' motion for summary judgment to the extent it seeks to dismiss the Plaintiff's claims against all of the Defendants based on retaliation under the NYSHRL.

**D.     The Plaintiff's Claims of a Hostile Work Environment under Title VII and the NYSHRL**

The Plaintiff claims that he was subjected to a racially hostile work environment, in violation of Title VII and the NYSHRL, which was caused and/or perpetuated by Betty Cross, and which can be imputed to the District.

**1.     The Standard of Review**

The Plaintiff's hostile work environment claims under Title VII and NYSHRL are analyzed using the same legal standard.  See Russo v. New York Presbyterian Hosp., 972 F. Supp. 2d 429, 449 (E.D.N.Y. 2013); Sullivan, 281 F. Supp. 2d at 708; Lumhoo v. Home Depot United States, 229 F. Supp. 2d 121, 152 n.27 (E.D.N.Y. 2002).

"Title VII prohibits an employer's conduct that 'has the purpose or effect of . . . creating an intimidating, hostile, or offensive working environment,' and 'affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.' " Lumhoo, 229 F. Supp. 2d at 152 (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)).  In this regard, "[t]o withstand summary judgment, [the] Plaintiff must produce evidence that 'the workplace was so permeated with discriminatory intimidation, ridicule, and insult, that the terms and conditions of h[is] employment were thereby altered.' " Id. (quoting Mills v. S. Conn. State Univ., 519 F. App'x 73, 75 (2d Cir. 2013)).

"[T]o establish a hostile work environment claim under Title VII, a plaintiff must produce evidence that the complained of conduct '(1) is objectively severe or

persuasive – that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's . . . protected characteristic.' " <u>Russo</u>, 972 F. Supp. 2d at 446 (quoting <u>Robinson v. Harvard Prot. Servs.</u>, 495 F. App'x 140, 141 (2d Cir. 2012)). With regard to the third element, the Plaintiff is required to link the actions by the Defendants to his Caucasian race. <u>See</u> <u>Johnson</u>, 2014 U.S. Dist. LEXIS 133175, at *31-*32 ("Although '[f]acially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim,' plaintiff nevertheless must offer some evidence from which a reasonable jury could infer that the facially neutral incidents were in fact discriminatory" (internal citations omitted)).

"In examining whether an environment is sufficiently hostile or abusive, courts consider the totality of the circumstances, including such factors as '(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted.' " <u>Lumhoo</u>, 229 F. Supp. 2d at 152 (quoting <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 712 (2d Cir. 1996)).

In this regard, the Court notes that, although "the standard for establishing a hostile work environment is high, . . . [t]he environment need not be 'unendurable' or 'intolerable.' " <u>Sclafani v. P.C. Richard & Son</u>, 668 F. Supp. 2d 423 (E.D.N.Y.

2009) (quoting <u>Terry v. Ashcroft</u>, 336 F.3d 128, 148 (2d Cir. 2003)); <u>see</u> <u>Fitzgerald v.</u>

<u>Henderson</u>, 251 F.3d 345, 358 (2d Cir. 2001) (noting that "invidious harassment

that did not make the plaintiff's job unendurable or intolerable may support a claim

of hostile work environment . . ."), <u>cert. denied</u>, 536 U.S. 922, 122 S. Ct. 2586, 153

L. Ed. 2d 776 (2002).

    "[T]he Second Circuit has cautioned [that] the existence of a hostile work

environment is a mixed question of law and fact which is especially well-suited for

jury determination and summary judgment may only be granted when reasonable

minds could not differ on the issue."   <u>Dabney v. Christmas Tree Shops</u>, 958

F. Supp. 2d 439, 458 (S.D.N.Y. 2013), <u>aff'd</u>, 588 F. App'x 15 (2d Cir. 2014) (internal

quotation marks and citation omitted).

    Further, "[o]nce a plaintiff has established the existence of a hostile

workplace, [he] must then demonstrate that the harassing conduct 'which created

the hostile situation should be imputed to the employer.' " <u>Distasio v. Perkin Elmer</u>

<u>Corp.</u>, 157 F.3d 55, 63 (2d Cir. 1998) (quoting <u>Kotcher v. Rosa and Sullivan</u>

<u>Appliance Ctr., Inc.</u>, 957 F.2d 59, 63 (2d Cir. 1992)); <u>see</u> <u>Smith v. Town of</u>

<u>Hempstead Dep't of Sanitation Sanitary Dist. No. 2</u>, 798 F. Supp. 2d 443, 452

(E.D.N.Y. 2011) (Spatt, J.) (noting that in order to succeed on a hostile work

environment claim against an employer, the plaintiff must show that a specific

basis exists for imputing the conduct that created the hostile work environment to

the employer (quoting <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 221 (2d Cir. 2004)).

"When the harasser is the supervisor, the employer is presumed to be absolutely liable." Distasio, 157 F.3d at 63 (citing Faragher, v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee"); Burlington Indus. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) (same)).   In this regard, it has been held that "[w]here the harasser is . . . an individual 'empowered to take tangible employment actions against the victim,' and 'the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.' "   Russo, 972 F. Supp. 2d at 447 (quoting Vance v. Ball State Univ., ___ U.S. __, 133 S. Ct. 2434, 2443, 186 L. Ed. 2d 565 (2013)).

## 2.   Application

### a.   Existence of a Hostile Work Environment

For purposes of this motion, the Defendants "admit[ ]that the alleged language used by Cross was inappropriate and may have been perceived as racially motivated."  Defs. Memo of Law at 13.  However, they submit that "[t]he Plaintiff has not produced any documentary or testimonial evidence that establishes that his workplace at the District was so infected with discrimination or intimidation to create a hostile workplace."  Id. at 12.  The Court disagrees.

As discussed more fully above, there is testimonial evidence that the Plaintiff was "harassed [and] belittled on a daily basis" by Cross, beginning on "day one" of

his employment, and that he had complained to the District Superintendent "all the time" about Cross's treatment of him. Dr. Garcia recalled "numerous occasions" in Board meetings where Cross would "be extremely disrespectful to Mr. Geras" and would direct racially-charged comments at him. This is consistent with the Plaintiff's testimony that he was regularly "degraded" and "berated" by Cross, who called him such names as a "no good white man"; "white boy"; and "white racist."

Although the Defendants characterize the Plaintiff's testimony as "self-serving," his version of the relevant events is substantially corroborated. In fact, the Superintendent testified that she did not doubt the veracity of the Plaintiff's formal complaints that Cross had threatened to "destroy" him and have the community "lynch" him; or that she had told him that "no white man is going to come into this district and transfer a black man." Rather, Dr. Garcia testified that these remarks accurately reflected Cross's "type of language."

Further evidencing a hostile work environment is the evidence, which is disputed only by Cross's bare denials, that she personally disliked Geras, partly because he was hired instead of an African-American candidate that she had preferred. In this regard, the Superintendent testified that Cross "made it clear" to her that the District should exclusively hire African-Americans; that "Hempstead belong[s] to African-Americans"; and that she was on the Board to "take care of black people." There is also evidence that Cross told the Plaintiff that he did not "understand African-Americans"; that she did not want him in the District; and that she "wanted [him] replaced with an African-American."

Further, as noted above, there is evidence that Cross "told lies about" the Plaintiff and publicly disparaged his job performance, despite conceding that she lacked knowledge of the relevant underlying facts.

Further, the testimonial evidence suggests that Cross undermined the Plaintiff's ability to adequately perform his job by interfering with personnel decisions that were not usually within the ambit of the Board's authority.  For example, there is evidence that Cross actively opposed the Plaintiff's efforts to refer to the District Attorney for criminal prosecution an African-American groundskeeper who had stolen $286,000 in District property.  Instead, Cross accused the Plaintiff of being "a [n]o good white man racist, just trying to get the black man" and allegedly "brokered" an arrangement to allow the groundskeeper to resign, with benefits, and without paying restitution to the District.

There is also evidence that Cross interfered with Geras's supervision of Annette Greer, an African-American subordinate, by encouraging her to make race-based complaints against him.  The testimony suggests that, on numerous occasions, Cross applied intense pressure to the Superintendent to create written records of alleged wrongdoing by the Plaintiff, regardless of whether she, as his direct supervisor, believed it was appropriate to do so.

There is evidence that Cross had so interfered with the Plaintiff's participation in a decision to transfer Curtis Hewitt, an African-American custodian, that he felt Cross had "threatened [his] welfare" and his "livelihood" in a series of telephone calls.  As discussed above, over the course of several months

after this incident, the Plaintiff filed three separate charges of racial discrimination against Cross with the NYSDHR, as well as a related written complaint to the District. The evidence indicates that the Board initially took the Plaintiff's complaints sufficiently seriously to appoint an investigative counsel. However, attorney Ferris was discharged prior to interviewing any witnesses other than the Plaintiff, and without rendering any independent factual findings. In the Court's view, the evidence is sufficient to raise an inference that the investigation into Cross's conduct was prematurely terminated, by her, upon being elected as the Board President.

The Court finds this question to be close. However, under the circumstances, and in light of the Second Circuit's instruction that the existence of a hostile work environment is "especially well-suited for jury determination" rather than on a motion for summary judgment, see Dabney, supra, the Court concludes that there is enough evidence to allow a reasonable jury to find that the Plaintiff was subject to an objectively hostile work environment, on the basis of his race, which materially altered the conditions of his employment with the District for the worse.

### b. Imputation of Knowledge to the District

The Court also concludes that there is a sufficiently specific basis upon which to hold the District liable for the hostile work environment caused and/or perpetuated by Cross. In particular, the Court finds that a triable question of fact exists concerning whether Cross was a supervisor of the Plaintiff, so that her allegedly actionable conduct, as outlined above, should properly be imputed to the

District. In this regard, it is undisputed that Cross was, at all relevant times, a voting member of the Board and, at the time of the Plaintiff's termination, its President. There also is no dispute that the Board is a policy-making body with authority over a broad range of District operations, including administration-level personnel decisions.

Thus, in the Court's view, a reasonable jury could find that Cross was an individual of successively higher authority than the Plaintiff; that she was empowered to take tangible employment actions against him; and that her alleged harassment of him culminated in a tangible and adverse employment action.

Accordingly, the Court denies the Defendants' motion for summary judgment to the extent it seeks to dismiss the Plaintiff's claims against the District and the Board based on a hostile work environment under Title VII. The Court also denies the Defendants' motion for summary judgment to the extent it seeks to dismiss the Plaintiff's claims against all of the Defendants based on a hostile work environment under the NYSHRL.

**E.  The Plaintiff's Claim of Aiding and Abetting under the NYSHRL**

The Plaintiff brings a claim of aiding and abetting racial discrimination and retaliation under the NYSHRL against Betty Cross.

Under the NYSHRL, it shall be an unlawful discriminatory practice for any person to "aid, abet, incite, compel or coerce the doing of any act" forbidden under the statute. See N.Y. Exec. L. § 296(6). In Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995), the Second Circuit held that "the NYSHRL's aiding and

abetting section imposes individual liability on a person who 'actually participates' in the improper conduct." Frank v. Lawrence Union Free Sch. Dist., 688 F. Supp. 2d 160, 174 (E.D.N.Y. 2010).

As set forth above, the Court has already determined that genuine issues of material fact exist with regard to whether the Defendants, including the individual Defendant Cross, discriminated against the Plaintiff on the basis of his race and retaliated against him for engaging in protected activity. Further, the Court has already determined that there is sufficient evidence to raise a jury question as to Cross's personal involvement in the discriminatory and retaliatory conduct. Accordingly, in the Court's view, it necessarily follows that a sufficient factual premise exists for a reasonable jury to conclude that Betty Cross aided and abetted the alleged discrimination and retaliation by actually participating in it.

In this regard, the Defendants contend that summary judgment is warranted on the Plaintiff's aiding and abetting claims because Cross cannot be held to have aided and abetted her own conduct. The Court notes that this contention has been raised in a number of cases within this Circuit and rejected. See, e.g., Johnson v. County of Nassau, 82 F. Supp. 3d 533, 535, 536-37 (E.D.N.Y. 2015) ("[I]t is well-settled that an individual can 'aid and abet' his own conduct in violation of the NYSHRL"); Conklin v. County of Suffolk, 859 F. Supp. 2d 415 (E.D.N.Y. 2012) ("[T]he law in this Circuit seems clear that a defendant may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even where her actions serve as the predicate for the employer's vicarious liability"); Frank, 688

F. Supp. 2d at 174 (rejecting the contention that "an individual cannot 'aid and abet' his own conduct").

The Defendants cite no controlling case law in support of their position, and the Court's independent research has not revealed any authority to alter its reasoning.

Accordingly, the Court denies the Defendants' motion for summary judgment to the extent it seeks to dismiss the Plaintiff's claims against the individual Defendant Betty Cross based on aiding and abetting discrimination and retaliation in violation of the NYSHRL.

## F. The Plaintiff's Claims Under §§ 1981 and 1983

Finally, the Plaintiff brings claims against the Defendants for racial discrimination, retaliation, and hostile work environment under § 1981 and § 1983, alleging that his equal protection rights, as guaranteed by the Fourteenth Amendment, were violated as a result of the Defendants' conduct. As noted above, the Plaintiff's § 1981 claims are subsumed within his claims under § 1983, which is the exclusive vehicle for enforcing those rights. See McKinney v. Bennett, 06-cv-13486, at *12 n.1 (S.D.N.Y. Sept. 16, 2009). In this regard, the Court further notes that these constitutional claims arise from the same set of operative facts as the Plaintiff's federal and state causes of action, discussed in detail above.

Under similar circumstances, a district court within this Circuit noted that:

> The Second Circuit Court of Appeals applies the Title VII burden-shifting analysis in determining whether conduct was unlawfully discriminatory under Section 1983. See Annis v. Cnty. of Westchester, 136 F.3d 239, 245 (2d Cir. 1998) (citing Hicks, 509 U.S. at 506 n.1

> (assuming that the same burden-shifting analysis applies to both Section 1983 and Title VII claims of discrimination). Thus, where a plaintiff's Section 1983 claim parallels her Title VII claim, "[t]he elements of one are generally the same as the elements of the other and the two must stand or fall together." Feingold [v. New York], 366 F.3d [138,] 159 [(2d Cir. 2004)].

Wesley-Dickson, 973 F. Supp. 2d at 410 (dismissing claims of racial discrimination, hostile work environment, and retaliation under §§ 1981 and 1983, because those claims paralleled the plaintiff's related claims under Title VII).

Applying this standard, the Court finds that the Plaintiff's claims based on racial discrimination, retaliation, and hostile work environment under the federal and state antidiscrimination statutes are factually indistinguishable from his claims under § 1981 and § 1983, and seek redress for the same alleged harm. Accordingly, for the same reasons that the Plaintiff's Title VII claims pass Rule 56 muster under the McDonnell Douglas burden-shifting framework, so do the Plaintiff's related constitutional claims. Stated differently, under the authority outlined by the Southern District of New York in Wesley-Dickson, to the extent that Geras's § 1981 and § 1983 claims parallel his Title VII and NYSHRL claims, they must collectively stand together.

However, in addition to the elements of a Title VII claim, the Plaintiff's claims under § 1981 and § 1983 claims must survive an added layer of scrutiny. In particular, although "[m]ost of the standards applicable to Title VII claims . . . also apply to Section 1981 employment claims and Section 1983 equal protection claims," Johnson, 2014 U.S. Dist. LEXIS 133175, at *48 (citations omitted), "the Second Circuit has noted 'several significant differences' between the standard

governing Title VII claims, on the one hand, and claims brought under Sections 1981 and 1983, on the other hand," id. (quoting Patterson v. County of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004)).  One such distinction is relevant here.

Under the well-settled authority of Monell v. Dep't of Social Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), and its progeny, "Section 1981 and Section 1983 claims against a municipality require proof 'that the challenged acts were performed pursuant to a municipal policy or custom.' "  Johnson, 2014 U.S. Dist. LEXIS 133175, at *48 (quoting Patterson, 375 F.3d at 226); see Smith, 798 F. Supp. 2d at 452 (noting that "to prevail on a Section 1981 or 1983 hostile work environment claim against a municipal employer, a plaintiff must show that the harassment derived from a municipal policy or practice").

Where, as here, a municipal investigation into allegations of discrimination and retaliation was conducted by policymakers, such as the Board of Education, evidence that the investigation may have been inadequate, supports liability under § 1981 and § 1983.  See, e.g., Smith, 798 F. Supp. 2d at 454 ("[T]he individuals who conducted the investigation into the hanging of the noose were policy makers for the Sanitation District.  Thus, the evidence that their investigation may have been insufficient raises a triable issue of fact as to whether their failure to conduct an adequate investigation could be attributed to the Sanitary District as municipal policy"); see also Rookard v. Health and Hospitals Corp., 710 F.2d 41, 45 (2d Cir. 1983) ("Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy"); Johnson

v. County of Nassau, 10-cv-6061, 2014 U.S. Dist. LEXIS 133175, at *51 (E.D.N.Y. Sept. 22, 2014) ("With respect to plaintiff's hostile work environment claims, some of the individuals who conducted the investigation into plaintiff's harassment . . . were policymakers for the County. . . . Evidence that their investigation may have been inadequate . . . thus supports liability under Section[ ] 1981" (internal citations omitted)).

In this case, the Defendants concede that the District and the Board were aware of the Plaintiff's complaints of harassment by Betty Cross, particularly, the March 21, 2012 formal written complaint. The Defendants also concede that, in response to these allegations, the Board appointed a special counsel to investigate the matter. However, the evidence shows that the investigation consisted of a single interview – of the Plaintiff – before being discontinued at or about the same time that Cross was elected as Board President. Further, there is no evidence that the District or the Board ever took steps to investigate the matter further, or that independent factual findings relating to the incident were ever prepared.

In this regard, there is also testimonial evidence to suggest that "numerous complaints" were made about Cross's racially disparaging comments by staff, principals, and administrators within the District, as well as a contractor associated with RJ Painting and the District's General Counsel, but that no action was taken by the District or the Board in response. The Defendants have presented no evidence to materially dispute these allegations and Cross's bare denials are insufficient to warrant judgment as a matter of law.

However, apart from the Defendants' investigation, the evidence, discussed more fully above, that Cross took actions both directly and through her influence on the Board, to violate the Plaintiff's constitutional rights is sufficient to raise a question of fact on the issue of municipal liability. In this regard, the evidence demonstrates that Cross was, at all relevant times, a policy maker for the District. Thus, a special standard is applied to her conduct. For example, "[a] plaintiff can show a municipal custom, policy or practice by establishing that an official who is a final policymaker directly committed or commanded the constitutional violation." Frisenda v. Inc. Village of Malverne, 775 F. Supp. 2d 486, 520 (E.D.N.Y. 2011) (quoting Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 478 (E.D.N.Y. 2002) (collecting cases). Under the facts and circumstances of this case, the Court finds that the evidence is sufficient to raise a triable question of fact on the issue of municipal liability and defeat summary judgment.

Therefore, the Defendants' motion for summary judgment, to the extent it seeks to dismiss the Plaintiff's claims against the Defendants under § 1981 and § 1983, is denied.

## G.    As to Whether Betty Cross is Entitled to Qualified Immunity

The Defendants assert that liability may not lie against the individual Defendant Betty Cross because she is entitled to qualified immunity. This contention is also without merit.

"Qualified immunity protects officials from liability for civil damages as long as 'their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.' " <u>Winfield v. Trottier</u>, 710

F.3d 49, 53 (2d Cir. 2013) (quoting <u>Gilles v. Repicky</u>, 511 F.3d 239, 243 (2d Cir.

2007)). "In deciding qualified immunity, courts ask whether the facts shown [i]

'make out a violation of a constitutional right,' and [ii] 'whether the right at issue

was clearly established at the time of defendant's alleged misconduct.' " <u>Id.</u> (quoting

<u>Pearson v. Callahan</u>, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

In this case, the Defendants assert that summary judgment is warranted

because the Plaintiff "has failed to identify what statutory or constitutional right

that Cross violated." However, as is clear from the Court's foregoing opinion,

genuine issues of material fact exist with regard to Cross's involvement in the

alleged violation of several statutory and constitutional rights of the Plaintiff.

Accordingly, the present record does not support a finding of qualified immunity

and the motion for summary judgment on that basis is denied.

### III.    Conclusion

Based on the foregoing, the Defendants' motion for summary judgment is

granted in part and denied in part.

In particular, the Court grants the motion and dismisses the Plaintiff's

claims against the individual Defendant Betty Cross, which allege racial

discrimination, retaliation, and hostile work environment in violation of Title VII.

As set forth above, that statute does not provide for individual liability.

However, the Court denies the motion for summary judgment as it relates to

the Plaintiff's claims against Betty Cross based on racial discrimination, retaliation,

and hostile work environment under the NYSHRL, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. The Court also denies the motion as to the Plaintiff's claim against Betty Cross based on aiding and abetting discriminatory and retaliatory conduct under the NYSHRL and § 1981.

In reaching this conclusion, the Court rejects the contention that Betty Cross is entitled to qualified immunity, as a matter of law.

Further, the Court denies the Defendants' motion for summary judgment as it relates to each of the Plaintiff's claims against the Hempstead Union Free School District and the Hempstead Board of Education under Title VII, the NYSHRL, § 1981, and § 1983.

It is **SO ORDERED.**

Dated:      Central Islip, New York
            December 17, 2015          */s/ Arthur D. Spatt*
            ARTHUR D. SPATT
            United States District Judge